**Corrected**

# In the United States Court of Federal Claims

No. 19-471L
(Filed: October 6, 2021)

| | | |
|---|---|---|
| ATS FORD DRIVE INVESTMENT, LLC et al., Plaintiffs, v. THE UNITED STATES, Defendant. | * | Dismissal of Claim as a Sanction for a Plaintiff's Misconduct; Profane, Threatening, and Abusive Communications; Inherent Power |

Paul G. Nix and Ann M. Nix, Fishers, IN, pro se.

Brian R. Herman, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

Plaintiffs own real property adjacent to a railroad line in Marion and Hamilton Counties, Indiana. They contend that the United States violated the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad line into a recreational trail pursuant to the National Trail Systems Act, thus acquiring their property by inverse condemnation.

On February 23, 2021, the court issued a show cause order directed at two of the plaintiffs: Paul G. Nix and Ann M. Nix, a married couple. In that order, the court directed Mr. and Mrs. Nix to explain why their Fifth Amendment claim for just compensation should not be dismissed as a sanction for Mr. Nix's profane, threatening, and abusive communications directed at the appraisers retained by the United States Department of Justice to inspect Mr. and Mrs. Nix's property in conjunction with their claim. As explained below, based on the record before it, the court dismisses Mr. and Mrs. Nix's claim with prejudice as a sanction for Mr. Nix's misconduct.

## I. BACKGROUND

On February 22, 2021, defendant filed a motion requesting that the court order Mr. and Mrs. Nix to show cause why their claim should not be dismissed from this case. In that motion, defendant explained the arrangements it made for its appraisers to inspect the properties at issue in this lawsuit, and then described what occurred on February 12 as its appraisers were

conducting those inspections. To support its recitation of events, defendant attached to its motion a sworn declaration from one of those appraisers—Charles W. Rex IV of RMI Valuation, LLC —and its transcriptions of voicemail messages left by Mr. Nix for the appraisers.

The court conducted a recorded telephonic status conference on February 23, in part to obtain additional information regarding the events of February 12. The court heard from (1) Mark F. Hearne, II, former counsel of record for Mr. and Mrs. Nix;[1] (2) Stephen S. Davis, Mr. Hearne's co-counsel; (3) Mary Shambro, a paralegal working for Mr. Hearne's law firm; and (4) Brian R. Herman, counsel of record for the government. Thereafter, the court obtained a transcript of the status conference, which was filed on the case's docket.

Subsequently, on February 24, defendant filed a copy of its appraisers' telephone call log from February 12, and on February 25, Mr. and Mrs. Nix's former counsel filed a notice with information requested by the court. The court then directed defendant to submit, as evidence, the audio files of Mr. Nix's voicemail messages. After defendant submitted the files, which included a voicemail message of apology that Mr. Nix left for RMI Valuation, LLC on February 26, the court obtained a transcript of the messages, which was filed on the case's docket.

On March 8, Mr. and Mrs. Nix filed a response to the show cause order. Defendant responded to that filing on May 4, and Mr. and Mrs. Nix filed a reply on June 1. The court provided Mr. Nix, Mrs. Nix, and defendant with the opportunity to submit additional written evidence, but no one did so. The court then convened a show cause hearing on August 11, during which it heard testimony from Mr. Nix, Mrs. Nix, Mr. Rex, and Ms. Shambro.[2] A transcript of the hearing was filed on the case's docket.

The following account is derived from the aforementioned information and evidence.

**A. Arranging the Property Appraisals**

On February 1, 2021, Mr. Herman contacted plaintiffs' counsel with a plan for the government's appraisers to inspect plaintiffs' properties, "primarily from the trail itself and other public areas," and without Mr. Herman's presence. Mot. Order Show Cause ("Mot.") ¶ 2; accord Status Conference Tr. 7 (Davis) (indicating his understanding that the government's appraisers planned to conduct "drive-by" inspections, which would not involve the appraisers entering any of plaintiffs' properties), 19 ("Mr. Herman absolutely contacted me by email . . . to let us know that within a two-week period they would be conducting their appraisals."). Two days later, plaintiffs' counsel agreed to this plan, and "asked" that the appraisers "not speak with any

[1] The court granted Mr. Hearne's motion to withdraw as counsel of record for Mr. and Mrs. Nix shortly before convening the status conference.

[2] Defendant offered the testimony of Mr. Rex, who was subsequently cross-examined by Mr. and Mrs. Nix. Mr. and Mrs. Nix each made statements on their own behalf; defense counsel chose not to cross-examine them. The court called and examined Ms. Shambro; Mr. Nix subsequently offered Ms. Shambro an apology and defense counsel did not ask Ms. Shambro any questions.

property owners who might come out during the inspections and to direct all questions to counsel."[3] Mot. ¶ 3; accord Status Conference Tr. 20 (Davis) ("[B]ecause I was not going to be with them and because they were drive-by appraisals, we just asked them not to discuss the case or the property with the landowners."); Show Cause Hr'g Tr. ("Hr'g Tr.") 25 (Rex) ("I was given instructions by Mr. Herman, at the request of your counsel, not to talk to you."). Neither Mr. Hearne nor anyone at his law firm advised plaintiffs that the government's appraisers would soon be appraising their properties. Hearne Notice 1; Nix Resp. Show Cause Order ("Nix Resp.") 2-3;[4] accord Status Conference Tr. 20 (Davis) ("I do not believe that we notified the landowners at that time [of receiving notice from Mr. Herman] that the government appraisers would be coming by."); see also Status Conference Tr. 21-22 (Hearne) ("[I]n our general meetings and update meetings [with property owners] . . . , I will inform the owners of the process of . . . asserting a claim, and I also describe how the property valuation process works, in which they will have our appraisers and the government appraisers inspecting their property. I always advise them that . . . if the government appraisers are there and I'm not in attendance, please don't talk to the appraiser, to call me, I'm glad to interact if you have any concerns."); Hearne Notice 1 ("As our normal practice, we advise landowners at the outset of litigation that, as an essential part of the prosecution of their claims, one or more appraisals of their property will be conducted."); Hr'g Tr. 23 (Mr. Nix) ("A good stretch of time had gone by [since they executed a representation agreement with counsel] and we were not expecting anyone appraising the property . . . .").

**B. Mr. Rex's Encounter With Mrs. Nix**

For "the single-family residential properties" at issue in the case, the government's appraisers determined that they could obtain the information they needed by taking photographs of the properties from public roads and from the railroad right of way. Hr'g Tr. 12 (Rex). They began to inspect the properties on February 12. Id. at 13. On that date, Mr. Rex drove into the cul-de-sac at the end of Thistle Ridge in Fishers, Indiana, to inspect four properties, including the property owned by Mr. and Mrs. Nix. Id. at 12-13. He began taking photographs of the properties from the cul-de-sac. Id. at 13. Mrs. Nix noticed him and went outside to keep an eye on him. Id. at 22-23 (Mrs. Nix). Mr. Rex saw Mrs. Nix, and because he avoids taking photographs with people in them, he focused on the other three properties. Id. at 13 (Rex). Then, when Mrs. Nix moved out of frame, he took photographs of her property. Id. at 14, 26. Mrs. Nix went back outside to take out the trash, saw Mr. Rex taking photographs of her property, and believed that he was taking photographs of her. See id. at 23 (Mrs. Nix) ("[W]hen I took out my trash, I looked and there was this camera right in my face, and that startled me."[5]).

[3] It is typical for plaintiffs' counsel to instruct government appraisers not to speak to property owners to avoid, among other things, unintended admissions.

[4] Because the response to the order to show cause is not paginated, the court cites to the page numbers assigned by its electronic filing system.

[5] There is no evidence corroborating Mrs. Nix's assertion that Mr. Rex put his camera "right in [her] face." Hr'g Tr. 23 (Mrs. Nix). The court presumes that Mrs. Nix was being hyperbolic.

She approached Mr. Rex to ask what he was doing.[6] Id. (Rex). Mr. Rex responded that he was an appraiser working for the federal government and that any questions should be directed to her counsel.[7] Id. at 14-15. Mrs. Nix asked to see identification, Rex Decl. ¶ 6, and Mr. Rex gave her his business card, id.; Hr'g Tr. 15, 25 (Rex), which included his name, company, direct telephone number, general office telephone number, and cell phone number, Nix Resp. 16 (copy of the business card provided to Mrs. Nix). Mrs. Nix then identified herself for Mr. Rex and returned to her house. Rex Decl. ¶ 6.

Notwithstanding Mr. Rex's explanation and the information on the business card, Mrs. Nix "didn't understand" who Mr. Rex was. Hr'g Tr. 25 (Mrs. Nix); accord id. at 21-22 (Mr. Nix) ("Mrs. Nix did not understand from your conversation with her what was going on."), 23 ("[I]t was not understood that Mr. Rex was representing the Federal Government in any way . . . ."); Nix Resp. 4 ("Mrs[.] Nix's [behavior] and my voicemails are the evidence that we had no clue who this guy was and why he was taking pictures."). She considered him to be "a strange character" who she "did not feel safe with." Hr'g Tr. 26 (Mrs. Nix); accord Nix Resp. 5. Despite this concern for her own safety, Mrs. Nix decided that since Mr. Rex was—in her view—taking photographs of her, she could take photographs of him. Hr'g Tr. 26 (Mrs. Nix). She therefore retrieved her cell phone and returned outside. Id. at 15 (Rex), 26 (Mrs. Nix). Mrs. Nix started photographing Mr. Rex's vehicle. Id. at 15 (Rex); see also Nix Resp. 18-20 (three photographs of the vehicle taken by Mrs. Nix). She then approached the driver's side of the vehicle, where Mr. Rex was sitting behind the wheel with the window down, to take a photo of Mr. Rex. Hr'g Tr. 15 (Rex). Mr. Rex testified:

---

[6] It is unclear whether Mr. Rex was near his car or in his car during this initial encounter with Mrs. Nix. In the declaration he executed six days after the events at issue, he indicated that Mrs. Nix went "out to [his] vehicle" when he was taking photographs of the four properties. Decl. of Charles W. Rex IV ("Rex Decl.") ¶¶ 5-6. During the hearing conducted six months later, he testified that Mrs. Nix went "out to [his] car" while he was taking notes on his cell phone. Hr'g Tr. 14 (Rex).

[7] Mrs. Nix appears to dispute that Mr. Rex explained who he was and why he was in the cul-de-sac. Compare Nix Resp. 2 (setting forth Mr. Nix's assertion that "Mr. Rex did not . . . represent why he was photographing her and our house."), and Hr'g Tr. 23 (Mrs. Nix) ("So I went out there and I said, what are you doing? You said, I can't talk to you. That's what you told me."), with id. at 14-15 (Rex) ("I said, I'm taking photographs, I'm an appraiser working with the Department of Justice. If you have any questions, please contact your counsel."), 25 ("Mrs. Nix, I'm not sure if the information you just provided was accurate to the situation. I did explain that I was an appraiser for the Department of Justice and that's why I gave you my business card and asked you to talk to your counsel at the request of your counsel."). The court credits Mr. Rex's recollection of events. He has seventeen years of experience as an appraiser, id. at 8, and is accustomed to being approached by property owners—who are sometimes armed—while conducting appraisals, id. at 19-21. Indeed, he explained that he had seven other encounters with property owners along the railroad right of way at issue in this case, and when approached, would always explain who he was and what he was doing. Id. at 20. The evidence strongly suggests that Mr. Rex did not depart from his usual practice with Mrs. Nix.

> I put my hand up to the camera because she had the camera up—the telephone up in the cabin of the vehicle and I asked her, please do not take photos of my face. She then stated that she will take blank—whatever photos she wants to take because I didn't ask her permission to take photos of their property.[8]

Id. (footnote added); accord Rex Decl. ¶ 7 ("She proceeded to place the phone within the cabin of the vehicle through the driver's side window to film my face. I asked her to please stop photographing my face, but she responded that because I had not asked her permission to take photographs of her property, she would take photographs of whatever she wanted."); see also Nix Resp. 17 (photograph of Mr. Rex in his vehicle taken by Mrs. Nix). There is a dispute regarding how close Mrs. Nix got to Mr. Rex to photograph him in his vehicle. Compare Rex Decl. ¶ 7 (asserting that Mrs. Nix reached inside the vehicle), and Hr'g Tr. 15 (Rex) (same), with Nix Resp. 3 (setting forth Mr. Nix's contention that Mrs. Nix's photographs reflect that Mrs. Nix "did not penetrate [Mr. Rex's] vehicle space to get that photo"). But there is no dispute that Mr. Rex asked Mrs. Nix to stop taking photos of him, and that after he made that request, the conversation ended and Mrs. Nix walked away. See Rex Decl. ¶ 7; Nix Resp. 4; Hr'g Tr. 15 (Rex). Mr. Rex then departed the cul-de-sac. Rex Decl. ¶ 7. At no point did Mr. Rex enter onto Mr. and Mrs. Nix's property. Hr'g Tr. 13 (Rex).

After Mrs. Nix returned to her house, she called Mr. Nix, who was at his office, to express her concern with Mr. Rex's presence in front of their house and their encounter. Nix Resp. 2, 4; Hr'g Tr. 21, 24 (Mr. Nix). Mrs. Nix provided Mr. Nix with the three telephone numbers that were on Mr. Rex's business card. Nix Resp. 4. There is no evidence that Mrs. Nix called the police. Nor is there evidence that Mrs. Nix called her son, who lives directly behind her and Mr. Nix. See Hr'g Tr. 30 (Mr. Nix).

### C. Mr. Nix's Voicemail Messages and Telephone Calls

Approximately ten minutes after he left the cul-de-sac, Mr. Rex received a telephone call that he did not answer because he did not recognize the telephone number. Hr'g Tr. 16 (Rex). The caller was Mr. Nix, who left the following voicemail message (with a time stamp of 12:17 p.m.):

> Hi, Charles. It's Paul Nix calling. My wife called me indicating that you were at our home earlier today snapping pictures, et cetera, giving her really no information about what you were there for. Please call me at [redacted]. That's Paul Nix, [redacted]. That's my office number. My cell phone number is [redacted]. I expect a call from you at your earliest convenience. Thank you.

Voicemail Message Tr. 3. Mr. Rex did not return that call. Hr'g Tr. 16 (Rex), 31 (Mr. Nix); accord id. at 24-25 (Mr. Nix) ("I just don't understand why there wasn't a prompter response."); Nix Resp. 2 ("Mr. Rex did not feel free to simply return my call and answer a few simple

---

[8] Although the transcript correctly reflects Mr. Rex's use of the word "blank" during his testimony, it is clear to the court that the word "blank" was a placeholder for more provocative language.

questions . . . . A husband getting a call from his wife, concerned for her safety should not be met with less than an immediate response to his phone call for an explanation!").

Two minutes later, Mr. Nix left another voicemail message for Mr. Rex, this time using profanity:

> Hi, Charles. It's Paul Nix calling. My phone number at my office is [redacted]. Please call me at your earliest convenience. My wife indicates that you were at our house taking pictures and you gave her literally no information about why in the h*ll you were there doing that. So call me at your earliest convenience. Also, my cell phone number is [redacted]. Call me immediately to explain what in the h*ll you're doing there. Thank you.

Voicemail Message Tr. 4. Mr. Nix left another twenty-three voicemail messages for Mr. Rex over the next four hours, all of which were laden with profanity. Id. at 5-32. The fourth message Mr. Nix left for Mr. Rex provides a representative sample of these messages:

> Hello, Charles. This is Paul Nix calling. My wife called me because maybe you – I'm not sure if it was you personally – but somebody was at our house today and – taking pictures and then, oh, giving no information and, secondly, challenging her for taking pictures of you, et cetera. So excuse me, if you showed up at my f*cking house, you better tell me why in the h*ll you're f*cking there and what in the h*ll you're there for. If not, you got a problem.
>
> The problem is – with me is I'm at work and my wife is at home and you, son of a b*tch, are f*cking there giving my wife sh*t about, you know, whatever with no g*ddamn explanation. That's not acceptable to me.
>
> Call me at [redacted] or [redacted] and give me some g*ddamn explanation for why in the f*ck you think you have the right to come to my g*ddamn house and to tell my wife she can't take a picture of your g*ddamn car, your – et cetera. Give me a f*cking break. Do not f*cking show up when I'm home, son of a b*tch.

Id. at 6. Moreover, Mr. Nix used vulgar language in conjunction with the profanity in several of his messages. See, e.g., id. at 32 ("Grow a pair of b*lls. You or somebody in your g*ddamn company that has any f*cking b*lls, to talk to me about why you sent somebody to my house today . . . . [A]re there any men at your company or are you just a bunch of p*ssies?").

Even more problematically, Mr. Nix made implicit and explicit threats against Mr. Rex in several of his messages. In his seventh message, he stated: "I will hunt you down, I will find you." Id. at 10. Six minutes later, he left another message in which he proclaimed: "I will kick your a**. I will f*cking shoot you in the g*ddamn head if you show up at my house . . . ." Id. at 11. Less than thirty minutes after that message, he made another death threat: "But do not ever f*cking do that again to me, you son of a b*tch, or I will f*cking blow your head away." Id. at 12-13. Then, in his fourteenth voicemail message, he threatened: "And if you ever show up at

my g*ddamn house again without any authorization or prior authorization, expect, you know, to get your sh*t, you know, thrown in your face." Id. at 18. He later warned, in his seventeenth message, that if Mr. Rex returned to his house without permission, Mr. Rex might "encounter some greater . . . problem than [he] might think." Id. at 21. In his twentieth message, Mr. Nix remarked that "[i]t's a g*ddamn good thing for you or your representative that I was not home." Id. at 25. And, less than fifteen minutes later, he left a message in which he warned: "Either give me a response or do not ever send anybody to my f*cking house again or they could be greeted with much less respect than they were given by my wife." Id. at 27.

Mr. Rex did not listen to all of these voicemail messages at the time that Mr. Nix left them. Hr'g Tr. 17 (Rex). He got the gist of the contents of the messages after listening to one of the first.[9] Id. He did ultimately read the transcription of the messages, and characterized Mr. Nix as "angry" and the contents of the messages as "explicit" and sometimes "threatening." Id. at 18. However, he "did not take it personally to heart," believing that the messages reflected "just probably frustration and lack of understanding . . . ." Id.

In addition to the messages that Mr. Nix left for Mr. Rex, he left a profane and threatening message for another appraiser at RMI Valuation, LLC. See Voicemail Message Tr. 2 ("I don't care who you are or what you're doing, but we expect an explanation of who in the h*ll is taking a picture of our house. It's a good thing for you and your people that I was not home at the time. Okay? Do not ever do that again."). Mr. Nix also called a third appraiser at RMI Valuation, LLC shortly after Mr. Rex's encounter with Mrs. Nix. Rex Decl. ¶ 11. That appraiser answered the call and "attempted to diffuse the situation with Mr. Nix by confirming the details of [the] inspection, but instead was met with verbal threats and profanities at which point [he] disconnected the call." Id. Mr. Nix called that appraiser "an additional seven times." Id.

In the meantime, at approximately 12:30 p.m., Mr. Rex "alerted" Mr. Herman to the telephone calls from Mr. Nix. Mot. ¶ 13. Mr. Herman immediately contacted then-counsel for Mr. and Mrs. Nix. Id.; accord Hr'g Tr. 34 (Shambro) (indicating that Mr. Herman called Mr. Davis). Ms. Shambro was asked to contact Mr. Nix to determine what the issue was, and left a voicemail message when Mr. Nix did not answer her call. Hr'g Tr. 34 (Shambro); see also Status Conference Tr. 12 (Shambro) (indicating that she initially called Mr. Nix "a little after 1:00"). In her message, Ms. Shambro introduced herself, stated her understanding that there was an issue with an appraiser, and asked Mr. Nix to call her back. Hr'g Tr. 34 (Shambro); see also

[9] Although Mr. Rex testified that he got the gist of the voicemail messages from the first one, there is evidence suggesting that he may have misspoken. He characterized Mr. Nix's first message as "alarming," Hr'g Tr. 16 (Rex), even though Mr. Nix did not use any profane, threatening, or abusive language, see Voicemail Message Tr. 3, and sounded calm and measured, Voicemail Message from Paul G. Nix to Charles W. Rex IV (Feb. 12, 2021, at 12:17 p.m.) (on file with the court). Additionally, Mr. Herman represented that Mr. Rex initially contacted him at about 12:30 p.m. regarding the messages, Mot. ¶ 13, after Mr. Nix had left three messages, two of which were profane, see Voicemail Message Tr. 3-5. Thus, it is reasonable to suspect that Mr. Rex got the gist of the voicemail messages from listening to the second (or third) message he received from Mr. Nix, rather than the first.

Status Conference Tr. 14 (Shambro) (indicating that she explained, in her message, that Mr. Rex was a government appraiser). After Mr. Davis and Mr. Herman exchanged additional e-mail messages, Ms. Shambro called Mr. Nix again, and this time he answered the call. Hr'g Tr. 34 (Shambro); see also Status Conference Tr. 12-13 (Shambro) (indicating that she made this second call at around 2:00 p.m.). Ms. Shambro testified:

> I introduced myself, tried to determine what the problem was. [Mr. Nix] was extremely angry and yelling and speaking a lot of profanity. I barely got a word in, if any. I recall trying to say the reason why the Government's appraiser won't speak to you is because they're instructed not to speak to you because you are our client. I don't even know that I got all of that out. He was just cussing and yelling. The phone call probably lasted a minute, if that, maybe a little bit more, and I just recall saying I don't have to listen to this, and I ended the call.

Hr'g Tr. 35 (Shambro); accord Status Conference Tr. 12-14 (Shambro).

The fact that Mr. Nix was advised that Mr. Rex was taking photographs of his house in conjunction with this lawsuit is confirmed by Mr. Nix himself. In the sixth voicemail message he left for Mr. Rex, at 1:10 p.m., Mr. Nix stated:

> Yes, Paul Nix, [redacted]. That's [redacted]. That's my office number. And somebody today was at my house, like, taking pictures and my wife was, like, excuse me, who are you. They were saying, no, I don't – I don't have to talk to you, et cetera. But she did get some phone numbers. So essentially it would appear, as we later have determined, that this is regarding a – you know, whatever, a trail – a trail – trail issue that is related to our house. But the guy was, like, oh, you can't – you know, he had nothing to say to her, I can't talk to you. She took pictures. He's saying, oh, you can't take pictures of me, et cetera. Excuse me.
>
> So there's a problem here and the point is that there is no – there is no homeowner who should have some guy showing up taking pictures of their g*ddamn house that this guy thinks that he has no reason to explain who in the h*ll he is or why in the h*ll he is there. So excuse the h*ll out of me. But I expect more from anybody that's showing up at my house and so excuse me.
>
> Paul Nix, [redacted]. We live in Fishers, Indiana, and there is – of course, yeah, there is a trail thing. But that does not give some son of a bitch an opportunity to show up at my g*ddamn house and take pictures and have no g*ddamn explanation of who he is or why he's doing that.
>
> Thank you. Call me.

Voicemail Message Tr. 8-9 (emphasis added); see also Nix Resp. 4 ("Finally a lady calls me and I learn this man is an appraiser and was assessing properties along the Trail."), 5 ("[I]t did all make sense when I spoke with the lady and was informed it was about the trail."). Nevertheless,

Mr. Nix continued to leave profane, threatening, and abusive voicemail messages for Mr. Rex. See Voicemail Message Tr. 10-28. And, notwithstanding Mr. Nix's very clearly expressed concern over Mr. Rex's presence in front of his house, he did not call the police or return home. Hr'g Tr. 30 (Mr. Nix).

**D. Termination of the Attorney-Client Relationship and Mr. Nix's Apologies**

That same afternoon, Mr. Hearne initiated efforts to terminate the attorney-client relationship with Mr. and Mrs. Nix. Status Conference Tr. 14-15 (Hearne); see also Hearne Notice 1 (reflecting that Mr. Hearne sent a letter to Mr. and Mrs. Nix on February 17 explaining the need to terminate the attorney-client relationship and that the letter was delivered on February 22); Nix Resp. 5 (reflecting Mr. Nix's acknowledgement that he and Mrs. Nix received the letter). On February 22, Mr. Hearne filed a motion to withdraw as counsel for Mr. and Mrs. Nix and defendant filed its motion for a show cause order. The following day, the court granted both motions.

Thereafter, Mr. Nix offered apologies to the individuals who were subjected to his profane and abusive telephone calls and voicemail messages. On February 26, Mr. Nix called RMI Valuation, LLC and left a voicemail message for Mr. Rex:

> Good morning, Charles. Hey, I'm calling to apologize to you for a series of rant voicemails I left with you a couple of weeks ago. That was all a result of a huge misunderstanding. My wife had expressed some concerns to me when I was at the office. So anyway, real men know when they're wrong and they know how to apologize and that's what I'm doing. I'm calling to tell you I'm sorry. There's certainly no threat from me and I wish you the best. God bless you. Goodbye.

Voicemail Message Tr. 33; see also Nix Resp. 1 (characterizing the events of February 12 as "a massive misunderstanding"), 4 ("enormous misunderstanding"); Hr'g Tr. 29-30 (Mr. Nix) ("giant misunderstanding"). Then, in his response to Mr. Hearne's letter terminating the attorney-client relationship, Mr. Nix apologized to the staff at Mr. Hearne's law firm, but he then immediately attempted to justify his behavior:

> I do wish to apologize to your staff for my yelling, screaming, cussing voicemails, it would appear to me that the man at our house could have been more professional simply to address who he was and why he was at the end of our driveway taking pictures of our house. Rather than leaving the homeowners to wonder, is he a pervert, a rapist, is he going to break in as soon as she leaves the house? My wife's concern for her safety, became my concern for her safety.

Nix Resp. 5 (reproduced as written). Mr. Nix also expressed to the court some embarrassment over his voicemail messages. See id. at 4 ("I would not wish for the transcripts of my voicemails to be read aloud in my Sunday School class as I became more upset as the afternoon went by."); Hr'g Tr. 31 ("So I did get increasingly more upset and left voicemails that I'm not very proud of.").

**E. Mr. and Mrs. Nix's Responses to the Show Cause Order**

Mr. and Mrs. Nix received the court's show cause order on February 25, and the court received their response on March 8. In that response, Mr. Nix asserted that the letter they received from Mr. Hearne inaccurately described the events of February 12,[10] and contended that Mr. Hearne and Mr. Rex were "negligent" by not disclosing in advance that Mr. Rex would be conducting appraisals of their property for this lawsuit. Nix Resp. 3; cf. Hr'g Tr. 25 (Rex) ("I was given instructions by Mr. Herman, at the request of [plaintiffs'] counsel, not to talk to [plaintiffs]. That kind of hand-ties us to a degree, and I joked around with Mr. Herman after this incident that . . . these attorneys are going to get us killed. My preference would have been to be able to talk to [Mrs. Nix]."). Mr. Nix also remarked that it was "unfortunate that the encounter with Mr[.] Rex has created such drama," Nix Resp. 3, and expressed bewilderment that he and Mrs. Nix could face the dismissal of their claim as a sanction for his conduct, arguing that "this punishment is extreme given that once the situation was understood all in the same afternoon we were fine," id. at 4; see also id. at 2 ("I do not believe any homeowners['] property right should be infringed upon because of poor communication from those involved in the appraisal process.").

At the court's direction, defendant responded to Mr. Nix's submission on May 4, and Mr. Nix filed a reply on June 1. In that reply, Mr. Nix provided some additional information regarding his and his wife's personal circumstances. Nix Reply Show Cause Order 1. He stated that his business was negatively affected by the COVID-19 pandemic and related restrictions and lockdowns, causing him to lose $30,000 in income. Id. Due to this reduction of income, he and Mrs. Nix opted to begin receiving Social Security income earlier than they planned. Id. He further stated that his twin brother was placed in a memory care nursing home in August 2020, and due to the pandemic, could not have visitors. Id.

During the show cause hearing on August 11, Mr. Nix referenced these personal circumstances, and others, when explaining why he acted the way he did on February 12. Hr'g Tr. 28-29 (Mr. Nix). Specifically, beyond the previously described financial difficulties, Mr. Nix testified that Mrs. Nix recently had an unnerving encounter with the staff in a retail store, see id. at 28 ("[T]he staff . . . came out of the back room and almost assaulted her and were spraying Lysol in her face, et cetera."), that apparently increased their sensitivity to encounters with unfamiliar people. In addition, roughly an hour before Mrs. Nix called him at his office, Mr. Nix spoke with his brother and realized that his brother was unlikely to leave the nursing home, causing both of them to become emotional. Id. at 28-29. He characterized the incident described to him by Mrs. Nix as "the straw that broke the camel's back." Id. at 29.

Also during the show cause hearing, Mr. Nix reiterated his bewilderment that his behavior on February 12 could result in the dismissal of his and Mrs. Nix's claim:

---

[10] Mr. Hearne's letter terminating the attorney-client relationship is not in the record before the court, and therefore the court does not rely on that letter to ascertain the events of February 12.

> I got this order to show cause why our property rights should not be rescinded and I just felt like that the grievance on my end did not rise to the occasion of losing whatever compensation we would be entitled to over just really a misunderstanding . . . . I was party to the misunderstanding, but so [was Mr. Rex]. And so once that misunderstanding was cleared up, you know, there was no problem on our part at all.

Id. at 26-27; accord id. at 29 (testifying that he did not "understand the connection between" his actions on February 12, for which he apologized, and losing the right to pursue his claim for just compensation).

## II. DISCUSSION

Federal courts, including the United States Court of Federal Claims, possess the authority to sanction misconduct under their inherent power to manage their affairs and ensure that the judicial process is not abused. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-46, 50 (1991); Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980); United Med. Supply Co. v. United States, 77 Fed. Cl. 257, 264 & n.6 (2007). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44; accord Roadway Express, Inc., 447 U.S. at 764. Furthermore, when considering the imposition of such a sanction under their inherent power, courts must "comply with the mandates of due process . . . ." Chambers, 501 U.S. at 50. In other words, courts must provide the party facing the possibility of a sanction with notice and an opportunity to respond. Roadway Express, Inc., 447 U.S. at 767.

Here, the court provided Mr. and Mrs. Nix with notice of the possible sanction—dismissal of their claim with prejudice—and ample opportunity to respond with argument, written evidence, and oral testimony. Thus, the court devotes its attention to determining whether Mr. Nix's conduct is sanctionable and, if so, whether the dismissal of Mr. and Mrs. Nix's claim is an appropriate sanction.

With respect to the first inquiry, it cannot be disputed that Mr. Nix's conduct constituted an abuse of the judicial process and is therefore sanctionable. In Chambers, the United States Supreme Court stated that a court may impose sanctions if it "finds 'that fraud has been practiced upon it, . . . that the very temple of justice has been defiled,'" or "when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" 501 U.S. at 46 (first quoting Universal Oil Prod. Co. v. Root Ref. Co., 328 U.S. 575, 580 (1946); and then quoting Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)); accord Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 378 (Fed. Cir. 1994) (noting that federal courts have the "inherent power to impose sanctions for bad faith and vexatious conduct"). Mr. Nix left a legion of profane, threatening, and abusive voicemail messages for Mr. Rex that continued despite Mr. Nix learning of the reason for Mr. Rex's presence in front of his house. Mr. Nix was similarly profane and abusive when speaking on the telephone to two people—Ms. Shambro and Mr. Rex's colleague—who were trying to explain Mr. Rex's presence to him. These actions disrupted the work of Mr. Rex, Mr. Rex's colleague, and Ms. Shambro, as well as the work of the attorneys who were required to deal with the conduct as it was occurring. Moreover, the

attorneys and the court were then required to devote significant resources to addressing Mr. Nix's actions after the fact. Consequently, Mr. Nix's egregious, disturbing conduct unquestionably meets the definition of bad faith.[11] See also Level 3 Commc'ns, LLC v. United States, 724 F. App'x 931, 934-35 (Fed. Cir. 2018) ("Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." (internal quotation marks omitted) (quoting United States v. Gilbert, 198 F.3d 1293, 1299 (11th Cir. 1999))); Amsted Indus. Inc., 23 F.3d at 379 (indicating that "egregious conduct" may "justif[y] resort to the inherent power to sanction"); Fredin v. Middlecamp, Nos. 17-CV-03058 et al., 2020 WL 6867424, at *5 (D. Minn. Nov. 23, 2020) ("Abusive conduct sanctionable under the Court's inherent power includes extrajudicial communications intended to harass or intimidate opposing parties, their counsel, or the Court."), aff'd, 855 F. App'x 314 (8th Cir. 2021).

Having concluded that Mr. Nix's conduct is sanctionable, the court must determine whether Mr. and Mrs. Nix's claim should be dismissed, a sanction that, although "particularly severe," is within the court's authority to impose. Chambers, 501 U.S. at 45; accord Kadin Corp. v. United States, 782 F.2d 175, 177 (Fed. Cir. 1986) ("If [Claims Court] judges are to discharge their heavy responsibilities effectively, their power to dismiss . . . must be more than theoretical." (alteration in original) (quoting Automated Datatron, Inc. v. Woodcock, 659 F.2d 1168, 1170 (D.C. Cir. 1981))). Indeed, there are "three potential bases for dismissal . . . as a sanction for abuse":

> First, the court may decide that the errant party's behavior has severely hampered the other party's ability to present his case—in other words, that the other party has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case. Second, the court may take account of the prejudice caused to the judicial system when the party's misconduct has put an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay. And finally, the court may consider the need to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.

---

[11] Indeed, Mr. Nix's conduct might very well be characterized as criminal. See Ind. Code § 35-45-2-1 (2021) (defining the crime of intimidation to include "communicat[ing] a threat with the intent . . . that another person be placed in fear of retaliation for a prior lawful act" or "that another person be placed in fear that the threat will be carried out, if the threat is . . . [to] unlawfully injure the person threatened"); id. § 35-45-2-2 (defining the crime of harassment to include the "intent to harass, annoy, or alarm another person but with no intent of legitimate communication" by "mak[ing] a telephone call, whether or not a conversation ensues"); Roar v. State, 54 N.E.3d 1001, 1001-02 (Ind. 2016) (per curiam) (affirming a conviction under the intimidation statute for the defendant's statement to a property manager that "if [the property manager] came back on the property, he'd kill [her]" (alterations in the original)); McGhehey v. State, 171 N.E.3d 648 (Ind. Ct. App. 2021) (unpublished table decision) (affirming a conviction under the harassment statute for the defendant's profane and insulting voicemail messages).

Benedict v. Super Bakery, Inc., 665 F.3d 1263, 1268 (Fed. Cir. 2011) (quoting Webb v. Dist. of Columbia, 146 F.3d 964, 971 (D.C. Cir. 1998) (citations and internal quotation marks omitted)).[12] Regardless of the circumstances, a court should perform a thorough review of the record and consider whether a lesser sanction is appropriate before dismissing a case. Id.

A combination of the second and third bases for dismissing a claim as a sanction apply to the circumstances presented in this case. As noted above, Mr. Nix's conduct was an abuse of the judicial process. He directed his invective at appraisers retained by the government for this case and to an employee of his own counsel's law firm. By lashing out at these individuals, Mr. Nix impeded their efforts to pursue the litigation that he and Mrs. Nix initiated. Moreover, because the court was required to divert its resources to address Mr. Nix's misconduct, its ability to expeditiously adjudicate Mr. and Mrs. Nix's claim, as well as the claims brought by the other plaintiffs in this case and the claims of litigants in other cases, was adversely affected. The court's attention should be focused on resolving the merits of claims, not on dealing with a party's misconduct. Mr. Nix was disrespectful to the government, his own counsel, and the court, and his behavior significantly hampered the judicial process.

Furthermore, the severity of Mr. Nix's conduct warrants the dismissal of his and Mrs. Nix's claim with prejudice. Lesser sanctions—such as a reprimand, a fine, an award of defendant's attorney's fees and expenses, or the dismissal of their claim without prejudice—are inadequate to achieve the goals of inherent power sanctions: punishing the offender's misconduct and deterring future misconduct by the offender and other litigants. See Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the . . . court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."); 1 Sanctions: The Federal Law of Litigation Abuse § 28 (2020) ("Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process."). Not only did Mr. Nix, over the course of an afternoon, hurl profanity, abuse, and threats (including death threats) at individuals involved in this case, he willfully ignored their attempts to address his concerns and diffuse the situation. The court cannot countenance such appalling behavior, and nothing short of outright dismissal will make this point clear to Mr. Nix, Mrs. Nix, and all parties who appear before it.[13]

---

[12] Benedict is an appeal from the Trademark Trial and Appeal Board of the United States Patent and Trademark Office. 665 F.3d at 1264. In such appeals, the United States Court of Appeals for the Federal Circuit applies its own precedent to all procedural and substantive issues. See, e.g., In re Budge Mfg. Co., 857 F.2d 773, 775 (Fed. Cir. 1988).

[13] Contrary to Mr. Nix's assertions, the dismissal of his and Mrs. Nix's claim does not deprive them of any property rights. Rather, it deprives them of the ability to obtain compensation for the taking caused by the federal government permitting the railroad line adjacent to their property to be converted to a recreational trail. Fortunately, as they represented in their response to the show cause order, Mr. and Mrs. Nix "really love the Trail conversion from Rail, and . . . have been loving access to the Trail from [their] home for hiking and biking . . . ." Nix Resp. 3.

To be sure, Mr. Nix offered several explanations for his reaction to what Mrs. Nix told him of her encounter with Mr. Rex—Mrs. Nix's recent upsetting encounter at a retail store, their financial struggles, and his distress at his brother's circumstances. The court does not doubt that Mr. Nix was experiencing a heightened amount of stress on the day that Mrs. Nix encountered Mr. Rex. But even if this stress caused his initial outburst of anger, it cannot explain his failure to comprehend the multiple attempts to provide him with the information he sought or the escalation of his behavior after obtaining that information. It also does not explain why he did not, out of concern for Mrs. Nix's safety, call the police or return home.

The court also recognizes that Mr. Nix subsequently expressed contrition for his inexcusable behavior. However, he did not offer apologies to Mr. Rex and Ms. Shambro until after he and Mrs. Nix received a letter from Mr. Hearne—ten days after the conduct at issue—indicating Mr. Hearne's intent to terminate the attorney-client relationship. It apparently did not occur to Mr. Nix that his behavior was problematic until he learned that it would have a significant consequence: losing his representation in this case. Furthermore, his initial apology to Ms. Shambro was diminished by his attempt, in the same breath, to justify his behavior. There can never be a justification for making death threats, and there is no justification for the onslaught of profane, threatening, and abusive communications, especially when most of them were made after Mr. Nix learned the reason for Mr. Rex's presence in front of his house.[14] In short, the court is unconvinced that Mr. Nix would have expressed contrition absent the loss of representation and, subsequently, receipt of the court's show cause order. Accordingly, the court gives little weight to his apologies.

## III. CONCLUSION

Mr. Nix's misconduct on February 12 was beyond the pale. In more than fifteen years on the bench, the court has never seen a litigant behave in such a manner. It therefore finds that the dismissal of Mr. and Mrs. Nix's claim with prejudice is the appropriate, proportionate sanction to impose. Consequently, the court **DISMISSES** the claim of Paul G. Nix and Ann M. Nix **WITH PREJUDICE**. Pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims, there being no just reason for delay, the clerk of court shall enter judgment in defendant's favor with respect to the claim of Mr. and Mrs. Nix.

The clerk of court shall send this opinion to Mr. and Mrs. Nix at their mailing address of record.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

[14] That Mr. Rex did not listen to many of the voicemail messages at the time of receipt does not lessen their seriousness.