# In the United States Court of Federal Claims

No. 19-471L
(Filed: April 1, 2022)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ATS FORD DRIVE INVESTMENT, LLC et al., | * * * | Trails Act; Cross-Motions for Summary Judgment; Property Interest Acquired by the Railroad Company; Indiana Law; |
| Plaintiffs, | * * | Legislative Charter; Adverse Possession; Prescription; Centerline Presumption; |
| v. | * * | Competing Claims of Property Owners Association and Individual Property |
| THE UNITED STATES, | * * | Owners; Lost Conveyance Instruments; ICC Valuation Schedules and Maps; Burdens of |
| Defendant. | * | Proof; Quitclaim Deed; Common Property |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Mark F. Hearne, II, St. Louis, MO, for plaintiffs.

Brian R. Herman, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

Plaintiffs in this case, along with plaintiffs in five other cases before the undersigned, own real property adjacent to a railroad corridor in Marion and Hamilton Counties, Indiana.[1] They contend that the United States violated the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad corridor into a recreational trail pursuant to the National Trails System Act ("Trails Act"), thus acquiring their property by inverse condemnation. Four of the cases are proceeding in a coordinated manner, and a subset of plaintiffs from these cases assert claims that require the resolution of common threshold title issues. To resolve these issues, the parties in Pressly and ATS Ford cross-move for summary judgment. As explained in more detail below, the court grants in part and denies in part both motions in each case.

---

[1] The six cases are Oldham v. United States, No. 18-1961L (consolidated with Overlook At The Fairgrounds LP v. United States, No. 18-1962L); Pressly v United States, No. 18-1964L (consolidated with Jones v. United States, No. 19-1375L); Bradley v. United States, No. 19-400L; ATS Ford Drive Investment, LLC v. United States, No. 19-471L ("ATS Ford"); Episcopal Diocese of Indianapolis v. United States, No. 19-881L; and Doyle v. United States, No. 19-882L. A seventh case, ID Castings, LLC v. United States, No. 19-1158L, was voluntarily dismissed upon the parties' settlement of the plaintiff's claim.

# I. BACKGROUND

On January 19, 1846, the Indiana General Assembly enacted an "Act to incorporate the Peru and Indianapolis Railroad Company."[2]  Pursuant to that legislative charter, the Peru and Indianapolis Railroad Company ("PIRC") was authorized to construct a railroad line within Indiana originating in the town of Peru, running through the towns of Kokomo and Noblesville, and terminating in Indianapolis.  The legislative charter provided that the railroad corridor was to be no more than eighty feet wide, and could be acquired using a number of mechanisms:

> Sec. 15.  It shall be lawful for the corporation, either before or after the location of any section of the Road, to obtain from the persons through whose land the same may pass, a relinquishment of so much of the land as may be necessary for the construction and location of the road; as also, the stone, gravel and timber, and other materials that may be obtained on the said route, and may contract for stone, gravel, timber, and other materials that may be obtained from any land near thereto:  and it shall be lawful for said corporation to receive by donations, gifts, grants, or bequests, land, money, labor, property, stone, gravel, wood, or other materials, for the benefit of said corporation . . . .

> Sec. 16.  That in all cases where any person through whose land the road may run, shall refuse to relinquish the same, or when a contract by the parties cannot be made, it shall be lawful for the corporation to [initiate condemnation proceedings].

> . . . .

> Sec. 18.  That if it shall be found necessary and advantageous to the location and construction of said road, the corporation shall have the right to lay the same along and upon any county or State road:  <u>Provided however</u>, That before such location is made, the corporation shall make application to the county commissioners of the proper county, for such right; and said commissioners are hereby vested with power to grant the same, by an order entered upon their records:  <u>And provided also</u>, That such right shall be granted on condition that the corporation shall leave a sufficiency of said State or county road in as good repair, for common use, as previous to such occupation.

Further, with respect to the PIRC's acquisition of the railroad corridor, the legislative charter provided (footnote added):

> Sec. 19.  That when said corporation shall have procured the right of way, as herein before provided, they shall be seized, in fee simple, of the right to such land, and they shall have the sole use and occupancy of the same, but not to

---

[2]  The facts in this section are derived from the exhibits attached to the parties' summary judgment briefs and are not in dispute.

interfere with the right of way of any Railroad company heretofore incorporated;[3] and no person, body politic or corporate, shall in any way interfere with, molest, disturb or injure any of the rights or privileges hereby granted, or that would be calculated to detract from or affect the profits of said corporation.

In accordance with its legislative charter, the PIRC acquired the portions of the railroad corridor at issue in this case. It accomplished its acquisitions under section 15 of its charter through instruments that will be referred to generally as "releases," as well as pursuant to section 18 of its charter. It also acquired portions of the railroad corridor through deed, prescription, and court order.

A railroad line was constructed, and a railroad operated, in the corridor acquired by the PIRC. Eventually, in 1995, the line was purchased by three Indiana municipalities: the City of Fishers, the City of Noblesville, and Hamilton County. In 2017, the municipalities advised the Surface Transportation Board ("Board") of their collective desire to invoke the Trails Act, 16 U.S.C. §§ 1241-1251, which, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historical trails. Id. § 1247(d). The following year, they submitted three separate requests to the Board, each relating to a different segment of the railroad line, for the issuance of a Notice of Interim Trail Use or Abandonment ("NITU"). A NITU permits the discontinuation of rail service, the salvaging of track and materials, and, if an agreement regarding trail use is not reached, the abandonment of the line. 49 C.F.R. § 1152.29(d)(1). The Board issued the three NITUs on December 21, 2018, and the municipalities executed trail-use agreements in 2019.

After the Board issued the NITUs, a number of suits were filed in this court in which owners of parcels adjacent to the railroad corridor alleged that through the operation of the Trails Act and the issuance of the NITUs, defendant took their property without paying just compensation in violation of the Fifth Amendment. In June 2020, the plaintiffs in Oldham, Pressly, Bradley, and ATS Ford proposed a coordinated approach to resolving their claims. Specifically, they sought to divide themselves into three groups: Group 1 plaintiffs had claims with no outstanding liability issues and could proceed to damages, Group 2 plaintiffs had claims that required the resolution of an essentially identical threshold title issue, and Group 3 plaintiffs had claims with other threshold title issues. The court adopted their proposal.

While the parties were taking steps to determine the amount of just compensation due to the Group 1 plaintiffs, they briefed cross-motions for summary judgment with respect to the claims of the Group 2 plaintiffs. The central issue presented in those motions was whether the

---

[3] In the mid-nineteenth century, the Indiana General Assembly and Indiana courts regularly used plural pronouns and verbs in conjunction with collective nouns such as "corporation" and "company." Although not preferred in modern American English, this usage is common in British English, and was common in American English in the years following the American Revolution. See Bryan A. Garner, A Dictionary of Modern Legal Usage 170-71 (2d ed. 1995) (defining "collective nouns"). The court does not disturb this usage when quoting the PIRC's legislative charter and Indiana case law.

releases by which the railroad company acquired particular portions of the railroad corridor conveyed an easement or a fee simple estate.  In four substantially identical decisions, the court determined that precedent from the Indiana Supreme Court compelled the conclusion that the releases conveyed fee simple estates.[4]

The parties Pressly and ATS Ford now cross-move for summary judgment with respect to the claims of the Group 3 plaintiffs.[5]  They raise a number of threshold title issues common among the group, primarily concerning whether particular instruments (or the absence thereof) conveyed an easement to the railroad company.  Indeed, plaintiffs' briefs in the two cases are substantially identical with respect to many of the issues, and defendant filed nearly identical briefs (save for the caption) in both cases.[6]  The motions are now fully briefed, and none of the parties requested oral argument.  Thus, the motions are ripe for adjudication.

## II.  STANDARD OF REVIEW

Both plaintiffs and defendant move for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

---

[4]  The court issued these decisions on March 23, 2021, and reissued corrected decisions on December 3, 2021, nunc pro tunc to March 23, 2021.  See generally Bradley v. United States, 156 Fed. Cl. 640 (2021); ATS Ford Drive Inv., LLC v. United States, 156 Fed. Cl. 397 (2021); Oldham v. United States, 156 Fed. Cl. 159 (2021); Pressly v. United States, 156 Fed. Cl. 138 (2021).

[5]  Proceedings for the Group 3 plaintiffs in Bradley and Oldham are stayed pending the outcome of these motions, as are the proceedings in Episcopal Diocese of Indianapolis.

[6]  Because the briefs are so similar, court is filing a substantively identical decision in each case.  Only the captions are different.

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, if neither party satisfies this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See First Com. Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003) ("When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other.").

### III. DISCUSSION

The overarching issue raised by the parties in their motions is whether the Group 3 plaintiffs have a property interest in the railroad corridor such that the Board's issuance of the NITUs constituted a taking of that property interest.

### A. Legal Standard

The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. To establish a taking, a plaintiff must first "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); accord Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520 n.12 (Fed. Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims."). To demonstrate a cognizable property interest in a Trails Act case, a plaintiff must establish ownership in land adjacent to the railroad line described in the NITU and that ownership in that land can be traced to the railroad company's acquisition. Brooks v. United States, 138 Fed. Cl. 371, 377 (2018). A plaintiff must also establish that the railroad company acquired an easement for railroad purposes that continued to exist at the time of the alleged taking. Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009); Preseault v. United States ("Preseault II"), 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc). In general, state law governs the determination of the property interest acquired by the railroad company. See Preseault v. United States, 494 U.S. 1, 8 (1990); Preseault II, 100 F.3d at 1534. Moreover, the acquisition of property rights is governed by the law in effect at the time the rights were acquired. See Hash v. United States, 403 F.3d 1308, 1315 (Fed. Cir. 2005); Preseault II, 100 F.3d at 1534.

### B. Interest Acquired by the Railroad Company Over a Public Road

One subset of the Group 3 plaintiffs owns parcels adjacent to a portion of the railroad corridor situated along a public road. The parties have identified four documents purportedly related to the railroad company's acquisition of some or all of this portion of the corridor: (1) a release executed by J.G. Burns and seventeen others in the PIRC's favor on August 11, 1848

("Burns release"); (2) a resolution adopted by the board of commissioners of Hamilton County on September 7, 1848 ("county resolution"); (3) an order issued by the United States Circuit Court for the District of Indiana on May 17, 1897 ("court decree"); and (4) an ordinance adopted by the City of Noblesville in 1915 ("city ordinance").[7]

The Burns release is not in the record before the court.  Although it is likely that this instrument is similar, or identical, to the releases addressed in the court's decisions on the Group 2 summary judgment motions, the court declines to reach such a conclusion in the absence of the document.  However, the evidence in the record reflects that if the Burns release only conveyed an easement to the PIRC, the PIRC subsequently obtained a fee simple interest in the corridor one month later via the county resolution.

The county resolution was adopted in response to a petition by the PIRC to lay its railroad along a public road:

> Your Petitioner to wit the President and directors of the Peru and Indianapolis Rail Road Company would represent and show unto your honorable board, that after a careful survey of a rout[e] for said Rail Road from the mouth of Stoney Creek in said county to the Town of Noblesville & thence along Polk Street in said Town, your petitioners have found it to be necessary and advantageous to the location and construction of said Road, to lay and locate the same along and upon the State Road leading from the Town of Noblesville to Indianapolis, as to so much of said Road as lies between said Town of Noblesville, and the place where said Road crosses said Creek; your Petitioner therefore prays your honorable board to grant the same by an order to be entered upon the records of this honorable board; on condition however that the said Corporation who are known by the same and style of the "President and directors of the Peru and Indianapolis Rail Road Company" – shall leave a sufficiency of said State Road in as good repair for common use, as previous to such occupation, agreeably to the provisions of the charter of Incorporation of said Peru & Indianapolis Rail Road . . . .

Pressly Pls.' Ex. G-1.[8]  The county commissioners granted the petition:

---

[7]  For the following claims, the county resolution is the sole relevant conveyance:  Pressly 16, 103, 147a, 147b, 211, 247a, 247b, 268a, 268b, 268c, and 268d; and ATS Ford 10, 11, and 12. In addition, for the following claims, the county resolution, the court decree, and the Burns release are the relevant conveyances:  ATS Ford 2, 3, 4, 5, 6, 7, and 8.  Finally, the county resolution, the court decree, and the city ordinance are the relevant conveyances for the following claims:  Pressly 204a, 204b, 204c, and 204d.

[8]  When, as here, an exhibit is submitted by more than one party in support of its motion for summary judgment, either in the same or a separate case, the court cites to only one submission.

> Whereupon the matters and things in said Petition contained being duly considered & the board being fully advised in the premises [–] do order & decree that said corporation shall have the right & authority to locate said Rail Road & lay the same along and upon said State Road agreeably to the prayer of said petition – but this right so to locate and occupy said State Road as aforesaid is granted on this express condition that the said corporation shall leave a sufficiency of said State Road in as good repair, for common use, as previous to such occupation.

Id.  The language of the petition and county resolution mirrors the requirements of section 18 of the PIRC's legislative charter.  As required in section 18, (1) the PIRC found it "necessary and advantageous to the location and construction" of its railroad "to lay and locate the same along and upon" the identified "State Road"; (2) the PIRC applied to the proper county's commissioners; (3) the proper county's commissioners granted the application and entered an order in the county's records; and (4) both the PIRC and the county commissioners indicated that the PIRC's application was granted "on condition" that the PIRC "shall leave a sufficiency of" the identified state road "in as good repair, for common use, as previous to such occupation."  Furthermore, the PIRC's petition expressly referred to its legislative charter.  Accordingly, there can be no dispute that the PIRC acquired the relevant portions of the railroad corridor pursuant to section 18 of its legislative charter.

As defendant observes, sections 15, 16, and 18 of the PIRC's legislative charter describe ways in which the PIRC could acquire its railroad corridor—through relinquishment, condemnation, and application to the county commissioners.[9]  Section 19 then provides that when the PIRC "procured the right of way, as herein before provided," it "shall be seized, in fee simple, of the right to such land . . . ."  The Indiana Supreme Court concluded that section 19 was

> simply intended as declaratory of the effect which the releases and condemnations of land spoken of in the 15th and 16th sections should have; that is, whether they should be taken to convey an easement, a right of way merely, or a fee-simple title, and declaring it should be the latter . . . .

Newcastle & Richmond R.R. Co. v. Peru & Indianapolis R.R. Co., 3 Ind. 464, 468 (1852); accord Indianapolis, Peru & Chi. Ry. Co. v. Rayl, 69 Ind. 424, 429 (1880) ("That relinquishment . . . , supplemented by section 19 . . . of the act of incorporation, enacting that the right of way, when acquired, should be held by the company in fee-simple, purported to convey to the company an estate in fee-simple to so much of the land described in it as constituted the right of way through the land under such relinquishment."); Douglass v. Thomas, 2 N.E. 562, 564 (Ind. 1885) (remarking that the PIRC's legislative charter "expressly provided that the right of way, when acquired, should be held in fee-simple by the corporation").  In other words, it concluded that the PIRC obtained fee simple title through the execution of releases and through condemnation.  There is nothing in that court's reasoning, and the parties have not offered any

---

[9]  Section 17 of the legislative charter concerns the provision of notice of condemnation proceedings to property owners who are minors, incompetent, or reside in a different county.

other case law, suggesting that section 19 does not also apply to conveyances from county commissioners under section 18. Indeed, the plain language of section 19 indicates that it applies to all prior sections in the legislative charter describing the means by which the PIRC could obtain land for its railroad. Therefore, the PIRC acquired a fee simple estate in the land it acquired via the county resolution.

Almost fifty years after the county commissioners conveyed the land along its public road to the PIRC, one of the PIRC's successors, the Lake Erie and Western Railroad Company, brought suit against the City of Noblesville and a contractor, Michael Holloran, related to this portion of the railroad corridor. Pressly Pls.' Ex. G-4. On May 17, 1897, the United States Circuit Court for the District of Indiana issued an order approving and confirming the parties' settlement agreement. Id. The agreement specified that the City of Noblesville had the right to make planned improvements to a certain portion of the public road at issue, and that the railroad company would lower its tracks to conform to the grade of the road improvement, plank on the outside of the rails, and place ballast between the rails. The parties further agreed that

> the said Lake Erie and Western Railroad Company shall have the right to forever occupy its railroad track, depot and station grounds as now located in the City of Noblesville without interruption on behalf of the said City of Noblesville and without interference on the part of the said contractor Michael Holloran as the said property is now occupied . . . .

Id. Plaintiffs contend that this court decree establishes that the railroad company held only an easement over the public road. They are mistaken. As the court previously concluded, controlling Indiana Supreme Court precedent reflects that the PIRC obtained a fee simple estate in the land underlying the railroad corridor. There is no indication in the court decree that the railroad company intended to convey any property interest to the City of Noblesville, much less a fee simple estate with a retained easement. Rather, the court decree appears to be concerned solely with a dispute over the effects of the City of Noblesville's planned road improvements on the railroad tracks.

The final document at issue—the city ordinance—affects four contiguous parcels owned by one of the plaintiffs in Pressly. These parcels are adjacent to one side of the public road, and the portion of the railroad corridor conveyed via the county resolution is adjacent to the other side of the public road. Although the city ordinance is not included in the record before the court, other evidence in the record indicates that through the city ordinance, the City of Noblesville conveyed a separate corridor to the railroad company over the portion of the four parcels adjacent to the public road. See Pressly Pls.' Exs. B-6, C-2 at 29, G-5.[10] The Pressly plaintiffs acknowledge this conveyance in their summary judgment motion, but make no contentions regarding the property interest conveyed to the railroad company or whether the conveyed corridor was subject to the NITUs. In short, the Pressly plaintiffs do not allege that this conveyance affects their claims. Accordingly, the city ordinance is irrelevant for the purposes of determining their property interest.

---

[10] For all citations, the court uses the page numbers assigned by its electronic case filing system.

In sum, there are no genuine issues of material fact regarding the claims of the Group 3 plaintiffs who own parcels adjacent to the public road.  The PIRC obtained the land for this portion of the railroad corridor from the county in fee simple pursuant to sections 18 and 19 of its legislative charter.  Consequently, defendant is entitled to summary judgment with respect to these claims.

### C.  Interest Acquired by the Railroad Company Through a Court Decision

Another subset of the Group 3 plaintiffs owns parcels adjacent to a portion of the railroad corridor acquired by the Lake Erie and Western Railroad Company through a decision of the Marion County Circuit Court on June 29, 1907, arising from the railroad company's suit against Noah G. Manship and others.[11]  The Circuit Court's decision includes findings of fact, conclusions of law, and a judgment.  Pressly Pls.' Ex. E-1.  Plaintiffs contend that the Circuit Court's findings of fact indicate that the railroad company acquired a fee simple in a right-of-way easement through adverse possession, rather than a fee simple estate.  Of greatest relevance to plaintiffs' position are the following findings:

> 4.  [After incorporation in 1846], and prior to the year 1852, said Peru and Indianapolis Railroad Company located and constructed said line of railroad from Peru to Indianapolis, and as so located and constructed the same passed through the northeast quarter of section one, in township seventeen north, range four east, in Hamilton County, Indiana, running in a straight line south 27 degrees west through said entire quarter section.

> 5.  At the time said railroad was so located and constructed, said quarter section of land was a forest and wholly unimproved, and said railroad company entered upon and cut and removed the timber from a strip of ground forty feet in width on each side of the center line of the railroad track so located entirely across said quarter section, and constructed and maintained a single track railroad in the center of said strip, and the same has ever since been maintained and operated on the same line.

> . . . .

> 8.  On the 2nd day of June 1880, one J.C. Kimberlin was the owner in fee of all the said north east quarter of said section one except such portions thereof and such rights and interests therein as were held by the said Indianapolis, Peru and Chicago Railroad Company for its railroad and right of way aforesaid . . . .

> . . . .

---

[11]  The relevant claims are Pressly 1a, 1b, 56, 83, 93, 109a, 109b, 110, 124, 130, 151, 153, 215, 216, 249, 270a, 270b, 270c, 270d, 270e, 278, and 290, and ATS Ford 21.

27.  That the plaintiff and its predecessor railroad companies ever since the location and construction of said line of railroad as aforesaid by said Peru & Indianapolis Railroad Company have continuously and successively and for more than forty years operated said line of railroad and here had the continuous and uninterrupted use of all the ground on each side thereof through said entire quarter section for right of way between the fences along the boundaries thereof located as in this finding set forth, and have been in the open use and occupancy of the same for railroad purposes to the full width of 39 to 40 feet on each side of the centerline of said main track for more than twenty years prior to the commencement of this suit under claim of right . . . .

Id. at 4-5, 18.

Defendant counters that the controlling language, conveying a fee simple estate, is found in paragraph 2 of the Circuit Court's conclusions of law—"That the plaintiff is the owner in fee simple of, and entitled to a judgement as against the defendant Noah G. Manship, quieting its title to its right of way," id. at 20—and in the Circuit Court's judgment—

It is therefore considered, adjudged and decreed by the Court that the plaintiff is the owner in fee simple, and its title be and the same is hereby quieted as against the defendant, Noah G. Manship, or any person claiming through, from or under him, to the following described real estate . . . , to wit,—

Its right of way . . . .

Id. at 23.  Specifically, defendant argues that the Circuit Court's fact findings cannot be construed to mean that the PIRC did not acquire this portion of the railroad corridor through a written instrument or that its successors acquired it through adverse possession, observing that the Circuit Court made no findings with respect to the existence of a written instrument and did not expressly find that the railroad company acquired its interest through adverse possession. These arguments are unpersuasive.

First, had the railroad company acquired its interest in the corridor through a written instrument, it undoubtedly would have produced it to the Circuit Court as evidence of its interest, and the Circuit Court assuredly would have mentioned it in its findings of fact.  Thus, it is reasonable to conclude that a written instrument did not exist.

Second, that the Circuit Court did not use the term "adverse possession" in its fact findings or legal conclusions is of no moment; findings that a railroad company satisfied the elements of adverse possession are sufficient.  See Meyer v. Pittsburgh, Cincinnati, Chi. & St. Louis Ry. Co., 113 N.E. 443, 444 (Ind. App. 1916) (indicating the parties' agreement that a finding of fact addressing the elements of adverse possession "disclose[d] an adverse occupancy of the parcel of land described in the decree").  At the time that the Circuit Court issued its decision, "[a]n entry upon land with the intention of asserting ownership, and continuing in the open and exclusive possession thereof, exercising the usual acts of ownership under such claim, without asking permission and in disregard of all other claims, [was] sufficient to make the

possession adverse," and "[s]uch possession continued uninterruptedly for 20 years or more [established] title to the extent that the possession [was] actual and exclusive."[12]  May v. Dobbins, 77 N.E. 353, 354-55 (Ind. 1906); accord Rennert v. Shirk, 72 N.E. 546, 547 (Ind. 1904) ("To be adverse, possession must be actual, open, and notorious, exclusive, continuous, and under a claim of right; that is, an intention to claim adversely.").  As noted above, the Circuit Court, in paragraph 27 of its findings of fact, found

> [t]hat the plaintiff and its predecessor railroad companies ever since the location and construction of said line of railroad . . . have continuously and successively and for more than forty years operated said line of railroad and here had the continuous and uninterrupted use of all the ground on each side thereof . . . , and have been in the open use and occupancy of the same for railroad purposes to the full width of 39 to 40 feet on each side of the centerline of said main track for more than twenty years prior to the commencement of this suit under claim of right . . . .

Pressly Pls.' Ex. E-1 at 15 (emphasis added).  These findings are sufficient to establish that the railroad company adversely possessed the corridor.

Plaintiffs, relying primarily on Meyer, argue that the Circuit Court's finding of adverse possession establishes that the railroad company acquired a prescriptive easement and not a fee simple estate.  In Meyer, the trial court found that the railroad company adversely possessed a parcel upon which it located and constructed its track and operated its railroad, and concluded that the railroad company owned the parcel in fee simple.  113 N.E. at 443-44.  This latter

---

[12]  More recently, the Indiana Supreme Court described the four elements of adverse possession as:

> (1)  Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

> (2)  Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

> (3)  Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways "hostile," elements); and,

> (4)  Duration—the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

Fraley v. Minger, 829 N.E.2d 476, 486 (Ind. 2005).

-11-

conclusion was challenged on appeal.  Id. at 443.  In support of its position that the trial court's judgment should be affirmed, the railroad company relied on section 19 of its predecessor's legislative charter, which, as in the PIRC's legislative charter, provided "[t]hat when [the railroad company] shall have procured the right of way as herein provided, they shall be seised in fee simple of the right to use such land, and shall have the sole use and occupancy of the same . . . ." Id. at 444-45.

After reviewing the relevant case law, the Appellate Court of Indiana stated that section 19 of the legislative charter did "not destroy or prohibit the exercise of the common-law power to contract," id. at 446 (citing Cleveland, Columbus, Cincinnati & Indianapolis Ry. Co. v. Coburn, 91 Ind. 557 (1883) (per curiam)), and that the parties to such a contract could agree to "create a less estate than a fee, or a right less in extent than that which the law authorizes the grantee to acquire," id. (quoting Cincinnati, Indianapolis, St. Louis, & Chi. Ry. Co. v. Geisel, 21 N.E. 470, 470 (Ind. 1889)).  Therefore, the court stated, "while prescription creates the presumption of a grant, a grant of the corpus of the land in fee simple is not necessarily presumed where the holder by grant may legally acquire an estate less in quantity or different in quality."  Id. at 446; see also id. (noting that "a fee may exist in an easement").  Thus, the question is "whether from the established prescriptive right a grant of the lands in fee must be presumed, or merely a grant of an estate or interest sufficiently comprehensive to protect the use as it has been exercised."  Id. at 447.  The court "conclude[d] that [the railroad company's] estate in the lands described in the decree, under the facts found, is an easement to use and occupy such lands for the purpose of maintaining and operating its railroad on and over the same, rather than an estate in fee simple in the land."  Id.

There is no material difference between the facts in Meyer and the circumstances described in the Circuit Court's decision in the Manship case.  In both cases, the trial court made findings of fact supporting a conclusion of adverse possession and concluded, as a matter of law, that the railroad company obtained fee simple title as a result of such adverse possession. Because the appellate court in Meyer reversed the trial court's decision and found that the railroad company obtained only an easement, it stands to reason that the railroad company in the Manship case also obtained an easement.

Having determined that the railroad company held an easement over this portion of the railroad corridor, the final issue to be addressed is whether the adjoining landowners own the fee simple estate underlying the easement.  In Indiana, it was an "established principal of common law," since codified, that "where there is no language in any of the relevant deeds describing real property that includes the right-of-way, the title of the owners of land abutting railroad rights-of-way runs to the center of the right-of-way."  Calumet Nat'l Bank as Tr. Under Tr. No. P-3362, Dated Sept. 1, 1986 v. Am. Tel. & Tel. Co., 682 N.E.2d 785, 790 (Ind. 1997); accord Swaim v. City of Indianapolis, 171 N.E. 871, 876 & n.1 (Ind. 1930); Cox v. Louisville, New Albany, & Chi. R.R. Co., 48 Ind. 178, 188 (1874); see also Ind. Code § 32-23-11-10 (2021) (codifying the common law).  Plaintiffs in Pressly and ATS Ford have produced the deeds by which they acquired parcels adjacent to these portions of the railroad corridor.  See generally Pressly Pls.' Ex. F-6; ATS Ford Pls.' Ex. E-3.  The descriptions of the parcels in these deeds do not include the railroad corridor, but instead provide either (1) an indication that one of the parcel's boundaries runs along the corridor or (2) a reference to a specified lot on a recorded plat.  See

Pressly Pls.' Ex. F-6 at 9, 34, 49, 73, 78, 82, 86, 111, 116, 145, 150, 170, 365, 374; ATS Ford Pls.' Ex. E-3 at 19.  Accordingly, it would appear that all of these plaintiffs own a fee simple estate to the centerline of the railroad corridor.

However, the court cannot reach this conclusion with respect to the claim of two of the plaintiffs in this subset of the Group 3 plaintiffs.  By way of background, the railroad corridor is adjacent to five parcels that are part of The Enclave of Fishers Pointe Horizontal Property Regime ("Regime").  Pressly Pls.' Ex. F-6 at 188-92.  There is one multiunit condominium building on each parcel.  Id.  According to the Regime's "Declaration of Horizontal Property Ownership," id. at 193, each condominium unit owner owns an undivided interest as a tenant in common in the common areas, which includes the real estate, yards, and parks situated between the buildings and the railroad corridor, id. at 201-02; see also ATS Ford Pls.' Ex. E-3 at 14 (depicting the location of the relevant building, the building's units, and the railroad corridor).  This document further provides that The Enclave of Fishers Pointe Co-Owners Association Inc. ("Association"), which consists of the owners of all of the condominium units, is responsible for the "maintenance, repair, upkeep, replacement, administration and operation of the Property," Pressly Pls.' Ex. F-6 at 203-04, and "the maintenance, repair, decoration, restoration, and replacement of the Common Areas," id. at 206.  Additionally, the Association is required to elect a board of managers, id. at 204, which is responsible for "representing all the Owners in providing for the management, administration, operation, maintenance, repair, replacement and upkeep of the Property exclusive of Condominium Units," id. at 205.  In fact, "[i]n the event of condemnation of all or any part of the Common Areas . . . , the Board of Managers is . . . authorized to negotiate with the condemning authority and/or contest an award made for the appropriation of such Common Areas."  Id. at 219.  Moreover, pursuant to the Regime's "Code of By-Laws," which enumerates in greater detail the duties and powers of the board of managers, id. at 238-41, the board of managers is empowered "to employ legal counsel . . . in connection with the business and affairs" of the Regime, id. at 241.  Finally, the Regime's declaration and bylaws both provide that all owners and future owners of the condominium units are "subject to" their provisions.  Id. at 225-26, 232; accord id. at 225 ("The acceptance of a deed of conveyance . . . shall constitute an agreement that the provisions of this Declaration [and] the By-Laws . . . are accepted and ratified by each such Owner . . . , and all such provisions shall be covenants running with the land and shall bind any person having at any time any interest or estate in a Condominium Unit or the Property as though such provisions were recited and stipulated at length in each and every deed . . . ."); Ind. Code § 32-25-9-1(a) ("Each condominium unit owner shall comply with . . . (1) the articles of incorporation or association; (2) the bylaws; . . . and (4) the covenants, conditions, and restrictions set forth in . . . the declaration[.]").

The Association asserts claims related to all five parcels adjacent to the railroad corridor that are part of the Regime (parcel numbers 15-14-01-00-04-999.999, 15-14-01-02-20-999.999, 15-14-01-02-19-999.999, 15-14-01-02-18-999.999, and 15-14-01-02-17-999.999).  Pressly Fourth Am. Compl. ¶ 200.  Elizabeth Reid and Margaret F. Reid jointly own a condominium unit in a building situated on one of the five parcels, ATS Ford Pls.' Ex. E-3 at 19, and assert a claim related to the parcel specifically associated with their unit (parcel number 15-14-01-00-04-005.000), ATS Ford Third Am. Compl. ¶ 29.  Because the parties, in their initial summary judgment briefing, did not address whether both the Association and the Reids can recover just

compensation for the taking of the common area adjacent to the railroad corridor, the court requested supplemental briefing on this issue.

In their supplemental briefs, plaintiffs assert that both the Association and the Reids could recover just compensation, but rather than supply a legal basis for that conclusion, presented the following stipulation:

> In Pressly, the Association will seek just compensation for the same land as the Reids in ATS Ford, but the Association will limit their monetary demand by not including the percentage of the Reids' undivided interest in the common area in their damage calculation. In ATS Ford, the Reids will seek just compensation for the same land as the Association in Pressly, but the Reids will limit their demand to their percentage interest in the common area in their damage calculation.

Pressly Pls.' Suppl. Br. 2; ATS Ford Pls.' Suppl. Br. 2. Defendant, in its initial supplemental brief, argues that because individual condominium unit owners are bound by the Regime's declaration and bylaws, and because those documents provide that the Association acts on behalf of the owners of the condominium units with respect to the common areas, the Reids cannot individually pursue a claim that the government took a portion of a common area without paying just compensation. Defendant did not address plaintiffs' stipulation in its supplemental response brief.

Nevertheless, the court agrees with defendant that only the Association can pursue a claim for just compensation with respect to the common areas owned jointly by the condominium unit owners as tenants in common. According to the Regime's declaration and bylaws, to which the Reids and the other condominium unit owners are legally bound, the Association, through the board of managers, represents the owners in managing and administering the common areas. Such representation includes maintaining the common areas, handling matters related to condemnation proceedings,[13] and retaining legal counsel. Given the broad authority granted to the Association to act on behalf of the condominium unit owners with respect to the common areas, there is no basis to conclude that the owners retained the ability to seek just compensation for the taking of a common area. Thus, although plaintiffs' proposed approach would ultimately lead the parties to the correct result, it is legally untenable. Accordingly, there being no genuine issues of material fact, the court grants summary judgment to defendant with respect to the Reids' claim.

There are also no genuine issues of material fact concerning the claims of the Association and the other plaintiffs who own parcels affected by the Manship case. However, unlike the Reids, these plaintiffs are entitled to summary judgment on the threshold issue of whether they own fee simple title to the centerline of the portion of the railroad corridor adjacent to their parcels.

---

[13] Although the Regime's declaration appears to concern the government's exercise of eminent domain, or direct condemnation, there is no reason to suspect that the Association would be responsible for handling direct condemnation negotiations and lawsuits, but not for handling inverse condemnation suits like this one.

**D.  Interest Acquired by the Railroad Company Through Purportedly Lost Conveyance Instruments**

A third subset of the Group 3 plaintiffs owns parcels adjacent to portions of the railroad corridor acquired by the railroad company through conveyance instruments that were either characterized as lost, or for which recording information was not provided, on the valuation schedules and maps prepared for the Interstate Commerce Commission ("ICC") in 1918.  Three of these instruments relate to one portion of the railroad corridor:  (1) an instrument, type unknown, executed by Carlisle Vanlaningham in 1849 ("Vanlaningham instrument"); (2) an agreement executed by L.D. Moody and his wife in 1897 ("Moody agreement"); and (3) an agreement executed by Lyman W. Curtis, a tenant, in 1897 ("Curtis agreement").[14]  A fourth relates to a separate portion of the railroad corridor:  an instrument, type unknown, executed by Elizabeth Seerley on April 21, 1849 ("Seerley instrument").[15]  Plaintiffs contend that because the ICC valuation schedules and maps lack recording information for these instruments or indicate that these instruments were lost, and because the trail operators and the railroad company did not produce these instruments in response to their subpoenas, they established that the instruments were lost and the burden to prove otherwise shifted to defendant.  Plaintiffs further contend that because these instruments have not been produced, the railroad company has only a railroad purposes easement over this portion of its corridor.  Defendant, in contrast, asserts that because the ICC valuation schedules and maps identify specific conveyance instruments, plaintiffs have the burden to produce either those instruments or other evidence regarding the interest acquired by the railroad company.  Defendant argues that plaintiffs' failure to marshal such evidence results in their inability to satisfy their burden of establishing a cognizable property interest.

**1.  ICC Valuation Schedules and Maps**

To properly address the parties' arguments, an examination of the purpose and contents of the ICC valuation documents is necessary.  On March 1, 1913, Congress enacted a statute, commonly referred to as the Valuation Act, requiring the ICC to "investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to" the Act's provisions, including "the original cost of all lands, rights of way, and terminals owned or used for the purposes of a common carrier," as well as "the amount and value of any . . . grant of right of way" and "the grants of land to any such common carrier."  Act of March 1, 1913, ch. 92, 37 Stat. 701, 701-02.  To implement the requirements of the Act, the ICC issued a series of orders in which it directed railroad companies to provide the necessary information on prescribed forms (valuation schedules) and standardized maps (valuation maps).  See, e.g., Interstate Com. Comm'n, Specifications for Maps and Profiles (Jan. 12, 1914) (commonly referred to as the "Map Order," and subsequently revised by Valuation Order Number 5, dated November 21,

---

[14]  The relevant claims are Pressly 41, 64a, 64b, 78, 95, 150a, 150b, 162, 284, 292a, 292b, and 298, and ATS Ford 32.

[15]  The Seerley instrument affects two claims:  Pressly 137 and 217.  Another instrument—executed by Powell Howland on April 25, 1849—affects a portion of Pressly 137; defendant does not seek summary judgment with respect to this portion of that claim.

1914; Valuation Order Number 6, dated November 21, 1914; and Valuation Order Number 23, dated March 9, 1920); Interstate Com. Comm'n, Orders, Instructions and Forms Pertaining to Schedules of Land (Nov. 21, 1914) (commonly referred to as Valuation Order Number 7 and modified with supplemental instructions dated November 1, 1916).[16]  As set forth in these orders—in particular the instructions for preparing valuation schedules described in Valuation Order Number 7—railroad company custodians maintained numbered files containing "each instrument conveying title to or interest in each parcel of land . . . ."  Valuation Order Number 7 at 5.  The supplemental instructions for preparing valuation schedules provided that (1) "[i]n the absence of deeds to lands owned," the railroad company should refer to "county, parish, or other properly authenticated records" to provide the required information; (2) for any parcels held by the railroad company through adverse possession, an "adverse possession" notation should be included in the "Remarks" column of the valuation schedule; and (3) for any parcels used but not owned by the railroad company, a "not owned" notation should be included in the "Remarks" column of the valuation schedule.  Supplemental Instructions ¶¶ 2-4.

For the Vanlaningham instrument, the valuation schedule indicates that the recording information was "Not Known"; that the grantee was the PIRC; that the land area was 3.008 acres; that for consideration, the railroad company was to build and maintain an undercrossing; and that the deed "has been lost but mention is made of it in" a complaint included in "Gen. Atty. file 3025."  Pressly Def.'s Ex. 6 at 6.  For the Moody agreement, the valuation schedule does not identify any recording information or consideration, but indicates that the grantee was one of the PIRC's successors and that the agreement was "[t]o settle suit for damages because of filling cattle pass by [railroad] company," as reflected in "Genl. Atty. file 3025."  Id.  The information on the valuation schedule for the Curtis agreement is substantially identical to what is provided for the Moody agreement, except for the notation that Mr. Curtis held a leasehold on the affected parcel, as reflected in "Genl. Atty. file 3441."  Id.  For the Seerley instrument, the valuation schedule indicates that no instrument was "found," that the grantee was the PIRC; that the land area was 9.312 acres, that the consideration paid was $20, and that the instrument was referred to in "correspondence file No. 20217."  Pressly Pls.' Ex. C-1 at 32.  The information included on the relevant valuation maps for all four instruments does not materially contradict the information included on the valuation schedules.  See Pressly Pls.' Exs. B-1, B-2.

## 2. Allocation of the Burdens of Proof

As noted above, plaintiffs bear the burden of establishing a cognizable property interest that was taken by their government.  Klamath Irrigation Dist., 635 F.3d at 520 n.12.  And, to satisfy that burden, plaintiffs must prove that the railroad company acquired an easement for railroad purposes.  Preseault II, 100 F.3d at 1533.  Plaintiffs assert in their initial summary judgment briefs that they satisfied their burden because the valuation schedules, valuation maps, and responses to their subpoenas demonstrate that the relevant conveyance instruments have been lost, resulting in prescriptive easements under Indiana law.  Then, in their supplemental briefs, responding to questions posed by the court regarding Indiana's standard for declaring deeds lost, plaintiffs assert that defendant, as the party seeking to demonstrate that the

---

[16]  These orders, as amended, were subsequently codified in parts 151 and 152 of title 49 of the 1938—and first—edition of the Code of Federal Regulations.

purportedly lost instruments conveyed fee simple estates to the railroad company, bears the burden of establishing that those instruments were lost and did, in fact, convey a fee simple interest. Defendant, in contrast, contends that plaintiffs bear the burden of demonstrating both that the instruments have been lost and the property interest conveyed by the instruments. The unique posture of the parties in Trails Act cases leads to the conclusion that neither party has properly allocated the burdens of proof with respect to lost conveyance instruments.

In Indiana, when a party wants to establish ownership of property through an instrument that has been lost,

> the party is required to give some evidence that such a paper once existed—though slight evidence is sufficient for this purpose—and that a <u>bona fide</u> and diligent search has been unsuccessfully made for it, in the place where it was most likely to be found, if the nature of the case admits of such proof; after which, his own affidavit is admissible to the fact of its loss.

<u>Thompson v. Thompson</u>, 9 Ind. 323, 333 (1857) (per curiam) (quoting 1 Simon Greenleaf, <u>A Treatise on the Law of Evidence</u> § 558). Only after establishing that the instrument is lost may the party introduce secondary evidence of the instrument's contents. <u>Meek v. Spencer</u>, 8 Ind. 118, 119 (1856) (per curiam). This standard presumes that the party averring that a conveyance instrument has been lost is doing so to establish that an interest had in fact been conveyed, <u>see, e.g.</u>, <u>Thompson</u>, 9 Ind. at 325; <u>Armstrong v. Azimow</u>, 76 N.E.2d 692, 693 (Ind. App. 1948) (en banc), or to establish the type of interest that was conveyed, <u>see, e.g.</u>, <u>Speer v. Speer</u>, 7 Ind. 178, 178-79 (1855). <u>See generally</u> <u>Howe v. Fleming</u>, 24 N.E. 238, 238 (Ind. 1890) ("To entitle a party to give parol evidence of the contents of a paper alleged to be lost, it is incumbent upon him to show that a diligent and careful search was made at the proper places, and by the proper persons, and that it could not be found.").

In a Trails Act case, however, the party averring that a deed has been lost—a present-day landowner—is typically doing so not to establish that the grantee—a long-since-defunct railroad company—acquired a particular property interest through that deed, but instead to establish that the grantee acquired through prescription only what it used. To prove, as plaintiffs allege here, that the railroad company acquired an easement through prescription, a landowner must demonstrate that all of the elements of prescription have been satisfied. And if, as here, a landowner's invocation of prescription is predicated upon the loss of the conveyance instrument, the landowner necessarily must establish that the conveyance instrument has been lost.[17] Upon doing so, the landowner need not marshal proof of the instrument's contents because such proof is not necessary to establish prescription. Consequently, the burden to demonstrate the

---

[17] The court recognizes that, "in general, the loss of [a paper] must be proved by the person in whose hands it was at the time of the loss, or to whose custody it is traced, if that person be living." <u>Murray v. Buchanan</u>, 7 Blackf. 549, 550-51 (Ind. 1845) (per curiam). However, this case, in which a present-day landowner is attempting to establish the property interest acquired by a railroad company in the nineteenth century, presents a scenario that cannot, as a factual matter, be subject to this general rule.

instrument's contents and, in particular, that the instrument did not convey an easement to the railroad company, falls on defendant.[18]

Having determined how the burdens of proof should be allocated, the first question to be answered is whether plaintiffs have established that the four purportedly missing instruments are, in fact, lost.

### 3. Are the Instruments Lost?

There is no dispute that the four purportedly missing instruments once existed.  Thus, to establish that these instruments are lost, plaintiffs must demonstrate only "that a bona fide and diligent search has been unsuccessfully made for" the instruments "in the place where [they] were] most likely to be found . . . ."  Thompson, 9 Ind. at 325.  To satisfy this requirement,

> [i]t is not enough to give some evidence of its loss, but [the party seeking to establish that a paper is lost] must give such evidence as will satisfy the court that the proper foundation for the admission of secondary evidence has been laid.  Where a paper which the law requires to be filed and kept by a public officer as part of the records or papers of his office is alleged to be lost, the court has a right to require, before receiving parol evidence of its contents, that careful and diligent search was made in the office, and by one so fully acquainted with the office, records, and papers as to make it probable that, if the paper was in the office, he would find it.

Howe, 24 N.E. at 238.  Under the law in effect in Indiana when the Vanlaningham and Seerley instruments were executed, "[e]very conveyance of any real estate" was required to be recorded in the county recorder's office, and a failure to record a conveyance instrument within ninety days would render the conveyance void as against subsequent good-faith purchasers of the real estate.  Ind. Rev. Stat. ch. 28, § 25 (1843); see also id. §§ 46, 48 (requiring county recorders to keep a book listing the conveyance instruments presented for recording and to record such instruments, and providing that if a certificate of acknowledgment or proof is not recorded with a conveyance instrument, the instrument cannot be "read or received in evidence"); id. ch. 8, §§ 6, 9-10 (requiring county recorders to keep a book listing the conveyance instruments presented for recording, to record all conveyance instruments, and to make an index of recorded conveyance instruments).  The same requirement applied when the Moody and Curtis agreements were executed, except that the deadline to record a conveyance instrument was forty-five days.  Ind. Rev. Stat. § 2931 (1881); see also id. §§ 2951-2952 (requiring county recorders to keep a book listing the conveyance instruments presented for recording and to record such instruments, and providing that if a certificate of acknowledgment or proof is not recorded with an instrument, the

---

[18]  Defendant's position—that so long as it can be established that a written conveyance instrument existed at one point in time, there can be no adverse possession, and thus the only way to establish ownership of a parcel conveyed by that instrument is to prove the instrument's contents—could lead to the unacceptable situation in which it would be impossible to prove the ownership of parcels that include ancient lost or destroyed conveyance instruments in their chains of title.

instrument cannot be "read or received in evidence"); id. §§ 5930-5931 (requiring county recorders to keep a book listing the conveyance instruments presented for recording, to record all conveyance instruments, and to make an index of recorded conveyance instruments).

Defendant argues that plaintiffs have not satisfied these legal requirements because they have not demonstrated that they conducted "a bona fide and diligent search" of the relevant county recorder's office for the purportedly missing instruments. Plaintiffs respond that although one would expect that these instruments would have been recorded at the time of execution, the railroad company did not provide recording information for the instruments on the valuation schedules and maps it prepared in 1918, and therefore it would be incorrect to assume that the instruments were, in fact, recorded.[19] Instead, they contend that the instruments were most likely in the possession of the railroad company, and that they satisfied the "bona fide and diligent search" requirement by seeking the instruments from the railroad company through a subpoena.

The valuation schedules and maps in the record before the court reflect that the railroad company acquired the pertinent portions of the corridor through written instruments. These valuation schedules and maps further reflect that the railroad company maintained copies of most of the written instruments it identified on those documents, as indicated by the assignment of a custodian number for those instruments. See generally Pressly Pls.' Exs. C-1, C-2. No custodian number was assigned to the four instruments at issue, indicating that the railroad company did not possess them at the time it prepared the valuation schedules and maps in 1918. Consequently, pursuant to Valuation Order Number 7, the railroad company was obligated in 1918 to refer to county records to provide the information required on the valuation schedules.

Presumably, the railroad company searched the county records for the instruments not in its possession; there is no evidence in the record before the court that it did not. See also United States v. Norton, 97 U.S. 164, 168-69 (1877) ("It is a presumption of law that officials and citizens obey the law and do their duty; and although it cannot supply the place of proof of a substantive fact, he who disputes it must furnish the requisite evidence to overcome its effect."); President of the Bank of the U.S. v. Dandridge, 25 U.S. 64, 69 (1827) ("[The law] presumes that every man, in his private and official character, does his duty, until the contrary is proved; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption . . . ."); cf. 37 Stat. at 703 (imposing a penalty of $500 per offense per day against carriers that failed or refused to comply with the requirements of the Valuation Act or the ICC's implementing orders).

---

[19] In their opening supplemental briefs, plaintiffs suggest that because they were not parties to the purportedly missing instruments, they could only speculate as to the location of the instruments. This contention is not well taken. The mandate that conveyance instruments be recorded is not a recent development in the law. See, e.g., 2 Lewis N. Dembitz, A Treatise on Land Titles in the United States § 126 (1895) ("The recording of deeds affecting land, or, as the English prefer to call it, the 'registry of assurances,' is the universal law and custom throughout the United States, and has been such almost from the first settlement of each of the colonies."). Consequently, the most obvious place to locate the four purportedly missing instruments is the relevant county recorder's office.

Although plaintiffs do not offer evidence that they conducted "a <u>bona</u> <u>fide</u> and diligent search" for the four purportedly missing instruments in the county records, they did not need to do so for three reasons. First, there is no requirement that the "<u>bona</u> <u>fide</u> and diligent search" be performed by the party seeking to have a conveyance instrument declared lost. Thus, plaintiffs are entitled to rely on searches performed by others. Second, the railroad company is deemed to have performed a search for the instruments in 1918 when preparing its valuation schedules and maps, and it would be duplicative to require plaintiffs to perform that same search in the county's pre-1918 property records. Third, in response to plaintiffs' subpoenas, the railroad company produced all of the conveyance instruments identified by plaintiffs that were in its possession, including instruments executed before 1918 but recorded after 1918. Because the uncontroverted evidence shows that the railroad company retained copies of conveyance instruments it recorded after 1918, and that the four purportedly missing instruments are not in the railroad company's possession, a search of the post-1918 county property records for these instruments is unlikely to be fruitful. Indeed, because timely recording would have protected the railroad company against claims by subsequent good-faith purchasers of the land described in the purportedly missing instruments, it is reasonable to presume that the instruments would not have been discovered in county records decades after they were executed.[20] Consequently, the Vanlaningham instrument, the Moody agreement, the Curtis agreement, and the Seerley instrument are, under Indiana law, lost instruments.

### 4. Contents of the Lost Instruments

Because plaintiffs have demonstrated that the four instruments at issue are lost, the burden of demonstrating that the instruments conveyed fee simple estates to the railroad company shifts to defendant. As noted above, secondary evidence can be used to establish the contents of the lost instruments, including the interests they conveyed. The relevant secondary evidence discussed in Indiana case law consists of copies of the lost instrument and testimony from witnesses able to describe the instrument's contents. <u>See, e.g.</u>, <u>McCormick Harvesting-Mach. Co. v. Gray</u>, 16 N.E. 787, 790 (Ind. 1888) (holding that "true and correct copies of the original instruments" could be admitted as evidence of the original instruments); <u>Thompson</u>, 9 Ind. at 334 ("The property conveyed, the estate created, the conditions annexed, the signing, sealing, and delivery, are required to be proved with reasonable certainty, by witnesses who can

---

[20] Plaintiffs assert that the railroad company recorded at least one conveyance instrument in 1927 that it executed, but did not record, decades earlier. The conveyance instrument upon which they rely does not support their assertion, since it indicates on its face that it was first recorded in 1901. <u>See</u> <u>Pressly</u> Pls.' Ex. F-2 at 5. However, the record submitted in support of the Group 2 summary judgment motions did include two conveyance instruments, produced by the railroad company pursuant to a subpoena, that appear to have been first recorded in 1927. <u>See</u> Pls.' Grp. 2 Summ. J. Exs. E (release executed on March 25, 1851, and recorded on March 14, 1927), S (release executed in the 1840s and recorded on March 14, 1927). It is, therefore, possible that the railroad company recorded other documents decades late. Nevertheless, the court is unwilling to presume that the railroad company recorded other conveyance instruments in a grossly untimely manner, especially since the railroad company did not produce copies of such instruments in response to plaintiffs' subpoenas.

testify clearly to its tenor and contents."); Willis v. Knauth, 137 N.E. 557, 558-59 (Ind. App. 1922) ("Where an instrument is shown to be lost, its contents may be established by parol proof, or the introduction of an exact copy thereof. . . . [S]uch contents may be established partly by one of such methods and partly by the other." (citations omitted)); Hagey v. Schroeder, 65 N.E. 598, 599 (Ind. App. 1902) ("The original contract had been lost, and, after the proper foundation was laid, appellee testified, without objection, as to the contents of the contract. Afterwards a witness testified that he had made an exact copy of the contract before the original was lost. There was no reversible error in admitting this copy in evidence. It did not differ in any material respect from the contents of the contract as testified to by the former witness."). It is undisputed that no such evidence is available here.

Nor has defendant offered any other evidence regarding the interest conveyed by the lost instruments.[21] Instead, defendant argues that the information provided on—and absent from— the relevant valuation schedules suggests that the Vanlaningham and Seerley instruments most likely conveyed fee simple estates to the railroad company, and that the information on the valuation schedules regarding the Moody and Curtis agreements indicates that those agreements did not convey any interest in the land previously conveyed by the Vanlaningham instrument. The former contention is unpersuasive; that the valuation schedules indicate that the railroad company was the grantee, reflect that the instruments were executed around the same time that the PIRC executed releases by which it obtained fee simple interests in the railroad corridor, and lack any notation that the railroad company adversely possessed or did not own the pertinent portions of the railroad corridor does not mean that the Vanlaningham and Seerley instruments conveyed fee simple estates rather than easements. Similarly, the court rejects the latter contention because the fact that the Moody and Curtis agreements were executed to settle suits for damages does not mean that no interests in the railroad corridor were conveyed through the agreements.[22] At bottom, defendant's arguments regarding the contents of the lost instruments are mere conjecture, falling well short of what is necessary to meet its burden. Accord Armstrong, 76 N.E.2d at 693 ("[T]he contents and execution of [a lost] deed must be proven with reasonable certainty.").

When an instrument conveying a portion of a railroad corridor has been lost and secondary evidence of its contents does not exist, Indiana law provides that, in general, the railroad company does not acquire fee simple title. See Ross, Inc. v. Legler, 199 N.E.2d 346, 348 (Ind. 1964) ("Public policy does not favor the conveyance of strips of land by simple titles to railroad companies for right-of-way purposes, either by deed or condemnation."). Rather, the presumption is that the railroad company acquires, by prescription, only as much as it uses. Consumers' Gas Tr. Co. v. Am. Plate Glass Co., 68 N.E. 1020, 1021 (Ind. 1903). Consequently, when a railroad company "enters without title and constructs its main line, . . . nothing more than an easement is acquired." Id.; see also Faukboner v. Corder, 26 N.E. 766, 767 (Ind. 1891) ("One

---

[21]   Such evidence might include other documents with a description of the lost conveyance instrument (for example, wills, other deeds, railroad company correspondence, or newspaper articles).

[22]   Of course, because Mr. Curtis is described as a "tenant," Pressly Def.'s Ex. 6 at 6, it is unlikely that the Curtis agreement conveyed a fee simple estate to the railroad company.

may acquire an easement in the lands of another by prescription.  To establish the existence of such easement he must show continuous, uninterrupted, adverse use, under claim of right, and with the knowledge and acquiescence of the owner of the land.  . . .  If there has been the use of an easement for 20 years, unexplained, it will be presumed to be under a claim of right, and adverse, and be sufficient to establish a title by prescription, and to authorize the presumption of a grant, unless contradicted or explained."); Hoffman v. Zollman, 97 N.E. 1015, 1017-18 (Ind. App. 1912) (holding, where the evidence reflected that the railroad company "continuously and adversely used and occupied [the] strip of land" for more than twenty years without color of title and was "in complete possession, occupancy, and control" of the strip of land, that the railroad company acquired a prescriptive easement).

In this case, there is no dispute that the PIRC and its successors operated a railroad through the corridor at issue continuously for more than twenty years.  The evidence in the record reflects that the PIRC "located and constructed" a railroad line between Indianapolis and Peru, Indiana, prior to 1852, and that the PIRC and its successors operated a railroad on that line until at least 1907.  Pressly Pls.' Ex. E-1 at 4-5, 22.  Accordingly, the PIRC and its successors possess a prescriptive easement over the portions of the corridor the PIRC originally obtained in 1849 via the now-lost Vanlaningham and Seerley instruments.  Furthermore, there is no indication that the railroad company acquired any rights greater than an easement when it executed the now-lost Moody and Curtis agreements in 1897.  Had such agreements resulted in the acquisition of fee simple title in that portion of the railroad corridor, the railroad company would have described a deed reflecting such a conveyance on the valuation schedule.

Having determined that the railroad company possesses a prescriptive easement over the portions of the railroad corridor at issue, the final issue to address is whether the adjoining landowners own the fee simple estate underlying the easement.  As noted above, "where there is no language in any of the relevant deeds describing real property that includes the right-of-way, the title of the owners of land abutting railroad rights-of-way runs to the center of the right-of-way."  Calumet Nat'l Bank, 682 N.E.2d at 790 (Ind. 1997).  Plaintiffs in Pressly and ATS Ford have produced the deeds by which they acquired parcels adjacent to these portions of the railroad corridor.  See generally Pressly Pls.' Ex. F-6; ATS Ford Pls.' Ex. F-5.  The descriptions of the parcels in these deeds do not include the railroad corridor, but instead provide either (1) an indication that one of the parcel's boundaries runs along the corridor or (2) a reference to a specified lot on a recorded plat.  See Pressly Pls.' Ex. F-6 at 30, 41, 45, 58, 90, 106, 121, 156, 369, 384, 389; ATS Ford Pls.' Ex. F-5 at 169.  Accordingly, these plaintiffs own a fee simple estate to the centerline of the railroad corridor.  There being no genuine issues of material fact, these plaintiffs are entitled to summary judgment on the threshold issue of whether they own fee simple title to the centerline of the portion of the railroad corridor adjacent to their parcels.

**E.  Interest Acquired by the Railroad Company Through Other Conveyance Instruments**

A fourth subset of the Group 3 plaintiffs owns parcels adjacent to portions of the railroad corridor acquired by the railroad company through four other conveyance instruments:  a warranty deed executed by John L. Wild and his wife on October 11, 1877 ("Wild deed"); a quitclaim deed executed by James M. Culbertson and his wife on February 19, 1910 ("Culbertson deed"); a release executed by Willis Threlkell on February 12, 1849 ("Threlkell

release"); and a release executed by James T. Wright on an unspecified date in the 1840s ("undated Wright release").[23] These instruments will be addressed in turn.

### 1. The Wild Deed

The first instrument at issue is the Wild deed. Plaintiffs did not produce a copy of this deed, and argue that because recording information was not provided on the valuation schedules and maps, the deed should be declared lost in the same way that the Vanlaningham instrument, the Moody and Curtis agreements, and the Seerley instrument have been declared lost. Defendant counters with the same arguments it previously advanced.

The relevant valuation schedule does not include any recording information for the Wild deed, but did set forth a custodian number. It also indicates that the grantee was a successor of the PIRC, that the deed was for a crossing at Chestnut Street, that the land area was 9882 square feet, and that the consideration paid was $185.29 (with the railroad company to maintain the crossing). Pressly Pls.' Ex. C-2 at 25. The information on the associated valuation map does not contradict the information included on the valuation schedule. See ATS Ford Pls.' Ex. B-5.

As discussed above, before a conveyance instrument can be declared lost, the party asserting that the deed is lost must "give some evidence that such a paper once existed—though slight evidence is sufficient for this purpose—and that a bona fide and diligent search has been unsuccessfully made for it, in the place where it was most likely to be found . . . ." Thompson, 9 Ind. at 333. Unlike with the Vanlaningham and Seerley instruments, the aforementioned valuation schedule and map reflect that the railroad company acquired the pertinent portion of the railroad corridor via a warranty deed and assigned a custodian number to the deed. It is therefore likely that the Wild deed was in the railroad company's possession at the time it prepared the valuation schedule and map, which would have relieved the railroad company of the obligation imposed by Valuation Order Number 7 to refer to county records to provide the information required by the ICC. Consequently, the court cannot presume that the railroad company searched the relevant county records for the Wild deed.

To satisfy the "bona fide and diligent search" requirement for the Wild deed, the county recorder's office must have been searched. Howe, 24 N.E. at 238; see also Ind. Rev. Stat. ch. 82, § 16 (1876) (requiring the recording of conveyance instruments within forty-five days for the instruments to be valid against good-faith purchasers), id. §§ 29-30 (requiring county recorders to keep a book listing the conveyance instruments presented for recording and to record such instruments, and providing that if a certificate of acknowledgment or proof is not recorded with a conveyance instrument, the instrument cannot be "read or received in evidence"); id. ch. 233, §§ 2-3 (requiring county recorders to keep a book listing the conveyance instruments presented for recording, to record all conveyance instruments, and to make an index of recorded conveyance instruments). Plaintiffs, however, present no evidence that a search for the Wild deed in the relevant county recorder's office was performed. Rather, they rely on the fact that

---

[23] These conveyance instruments affect four claims in ATS Ford: claims 9 (the Wild deed), 27 (the undated Wright release), 34 (the Culbertson deed and the Threlkell release), and 35 (the Culbertson deed).

they requested the Wild deed from the railroad company by subpoena as their sole evidence of a "bona fide and diligent search."  In the face of the requirement that a search for a conveyance instrument should be performed at the county recorder's office, plaintiffs' search efforts are insufficient.

In the absence of "a bona fide and diligent search," the Wild deed cannot be declared lost. Consequently, plaintiffs cannot establish, as a matter of law, that the railroad company acquired an easement over the relevant portion of the railroad corridor, a prerequisite to establishing a cognizable property interest.  There being no genuine issues of material fact related to the search for the Wild deed, defendant is entitled to summary judgment with respect to the claim of the Group 3 plaintiff who owns a parcel adjacent to the portion of the corridor that the railroad company acquired via the Wild deed.

### 2.  The Culbertson Deed

The second instrument at issue is the deed in which the Culbertsons quitclaimed all of their "interest right and title" in a forty-foot strip of land to the railroad company.  ATS Ford Pls.' Ex. H-2.  Specifically, the Culbertson deed provides:

> This Indenture Witnesseth, That James M. Culbertson and Mary R. Culbertson, his wife, of Marion County in the State of Indiana,
>
> Release and Quit Claim
>
> to The Lake Erie & Western Railroad Company, for the sum of One ($1.00) Dollar, the following Real Estate in Marion County in the State of Indiana, to wit:
>
> All our interest right and title in and to all that part of the East half of the South East Quarter of Section five (5) Township sixteen (16) North, Range four (4) East, lying within forty (40) feet of the center line of Grantee's main track on the Southeasterly side thereof containing one and forty seven one hundredths (1.47) acres more or less.

Id.  Plaintiffs contend that this deed conveys an easement because it does not specify the granting of a fee simple estate, it describes only nominal consideration, and public policy in Indiana disfavors the conveyance of fee simple title to strips of land.  Defendant, in turn, argues that this deed conveys fee simple title to the strip of land because there is no reference to a "right of way," no indication of the purpose for which the land would be used, and quitclaim deeds convey everything possessed by the grantor (which defendant assumes is a fee simple estate).

As defendant observes, when the Culbertsons executed this deed, Indiana law provided that "[a] deed of release or quitclaim shall pass all the estate which the grantor could convey by a deed of bargain and sale."  Ind. Rev. Stat. § 2924 (1881); see also Deed, Black's Law Dictionary (11th ed. 2019) (indicating that a "bargain-and-sale deed" is "[a] deed that lacks an express covenant about the validity of the title but implies that the grantor holds title to the property and

conveys it to a buyer for valuable consideration").  Defendant errs, however, in contending that a quitclaim deed that conveys land without limitation must convey a fee simple estate.  Rather,

> [t]he general principle is well settled, that a grantor, conveying by deed of bargain and sale and by way of release or quitclaim of all his right and title to a tract of land, if made in good faith and without any fraudulent representations, is not responsible for the goodness of the title beyond the covenants in his deed; and that a deed of this character purports to convey, and is understood to convey, nothing more than the interest or estate of which the grantor is seized or possessed at the time, and does not operate to pass or bind an interest not then in existence.

Nicholson v. Caress, 45 Ind. 479, 485 (1874); accord Habig v. Dodge, 25 N.E. 182, 185 (Ind. 1890) ("The general proposition is abundantly maintained that a deed of release or quitclaim, or a conveyance of the 'right, title, and interest' of the grantor, even though it be with full covenants of warranty, without designating in the instrument any particular estate, either as owned by the grantor or as conveyed by the deed, operates simply to transfer whatever interest the grantor may have had at the time.").  The record before the court lacks any direct evidence of the interest or title owned by the Culbertsons in the strip of land.  It is possible that they owned the strip of land in fee simple, but it is also possible that they held only a life estate, a future interest in an unspecified estate, or an easement.

The identity of the property interest possessed by the Culbertsons is a genuine issue of material fact.  Accordingly, the court declines to enter summary judgment to any party with respect to whether the affected plaintiffs own fee simple title to the centerline of the portion of the railroad corridor adjacent to their parcels by virtue of the Culbertson deed.[24]

### 3. The Threlkell Release and the Undated Wright Release

The final two instruments at issue are the Threlkell release and the undated Wright release.  The court addressed both of these releases in its Group 2 summary judgment decisions, concluding that they conveyed a fee simple estate to the railroad company.  See, e.g., ATS Ford, 156 Fed. Cl. at 414-15.  The court finds no reason to revisit this conclusion and, in fact, the

---

[24]  To the extent that the Culbertsons possessed fee simple title to the strip of land, the Culbertson deed conveys a fee simple estate to the railroad company.  Unlike in Vandalia Railroad Co. v. Topping, 113 N.E. 421 (Ind. App. 1916), relied upon by plaintiffs, the Culbertson deed does not use the term "right of way" or indicate the purpose of the conveyance. See also Consol. Rail Corp. v. Lewellen, 682 N.E.2d 779, 782 (Ind. 1997) ("The general rule is that a conveyance to a railroad of a strip, piece, or parcel of land, without additional language as to the use or purpose to which the land is to be put or in other ways limiting the estate conveyed, is to be construed as passing an estate in fee, but reference to right of way in such a conveyance generally leads to its construction as conveying only an easement" (quoting Brown v. Penn Cent. Corp., 510 N.E.2d 641, 644 (Ind. 1987))).  A separate distinguishing factor is that the railroad company in Vandalia Railroad Co. was organized under the 1852 law for the incorporation of railroad companies rather than by a pre-1952 legislative charter, as in this case.  See 113 N.E. at 423.

parties do not request that it do so.[25]  Therefore, in the absence of any genuine issues of material fact, defendant is entitled to summary judgment with respect to the claims of the Group 3 plaintiffs who own parcels adjacent to the portion of the corridor that the railroad company acquired via the Threlkell release and the undated Wright release.[26]

### F.  Intervening Strips of Land

The final subset of the Group 3 plaintiffs owns parcels in the Northeast Commerce Park subdivision of the City of Fishers.[27]  Northeast Commerce Park was established by local ordinance in January 1986 as a planned development district.  Pressly Pls.' Suppl. Ex. H.  Pursuant to that ordinance, which amended the then-Town of Fishers zoning code,[28] id. at 1, the subdivision could be developed in phases, id. at 5.  The ordinance also required that the subdivision have (1) covenants that "set forth in detail provisions for the ownership and maintenance of facilities held in common so as to reasonably insure their continuity and [conservation]," id. at 6, and (2) "[a]dequate provision . . . for [a] private organization with direct responsibility to, and control by, the property owners involved to provide for the operation and maintenance of all common facilities such as the retention pond," id. at 7; accord Pressly Pls.' Suppl. Ex. J at 323 (indicating, in the then-Town of Fishers zoning code, that "[w]here a Common Area is designated on the plat . . . of a commercial or residential project, a Property Owner's Association shall be formed and be required to provide necessary maintenance to the common area"), 460-61 (providing, in the "Platting of Multi-Family, Commercial, and Industrial Subdivisions" section of the then-Town of Fishers subdivision control regulations, that subdivision plats "shall include covenants"; that "those covenants shall explicitly establish the ownership, assessments, dues and programs which will insure the future maintenance of . . . on-

---

[25]  Plaintiffs initially contended that the Threlkell release had been lost, but conceded that it was not lost after defendant observed that it had been produced as an exhibit to plaintiffs' motion for summary judgment regarding the claims of the Group 2 plaintiffs.

[26]  Defendant contends that the claim affected by both the Culbertson deed and the Threlkell release, ATS Ford 34, must fail because the land conveyed by the Culbertson deed lies between the relevant parcel and the railroad corridor, cutting off any interest the parcel owner might possess in the railroad corridor.  Plaintiffs disagree, asserting that the Culbertson deed and the Threlkell release affect different portions of the parcel.  However, plaintiffs have not produced evidence demonstrating where the parcel is situated in relation to the land conveyed by the Culbertson deed and the Threlkell release, and the court is unable to discern this information from the evidence in the record.

[27]  The relevant claims are Pressly 32, 39, and 265.  A fourth claim, ATS Ford 20, was initially part of this subset, but defendant conceded liability on this claim and does not object to it being placed in Group 1.

[28]  The zoning code is one chapter of the comprehensive plan adopted by the then-Town of Fishers in 1980.  Pressly Pls.' Suppl. Ex. J at 40-41.  As relevant here, the 1980 comprehensive plan also included a chapter titled "Subdivision Control."  Id. at 40, 417-65.

site, nondedicated, development entities" such as "open spaces"; and that such "open spaces . . . are frequently referred to as 'common areas'").

In accordance with the 1986 ordinance, the owner of the subdivision, Northeast Commerce Park, an Indiana Limited Partnership ("Partnership"), recorded a "Declaration of Protective Covenants" ("Declaration"). See Pressly Pls.' Ex. D-5. The Declaration did not address ownership of common areas, but did provide for the creation of a property owners association, id. at 9, and did specify, in a section titled "Common Area Maintenance Expenses," that each lot owner was responsible for a "pro-rata share of all expenses associated with adequately maintaining and preserving the retention pond and all swales located in Northeast Commerce Park," id. at 38.

Thereafter, the Partnership, as permitted, developed the subdivision in phases. Pressly Pls.' Exs. D-1 at 2, D-2 at 3, D-3 at 2. The parcels owned by plaintiffs appear on the recorded plats of the first, seventh, and eighth phases, Pressly Pls.' Ex. F-6 at 21, 25, 175, and are separated from the railroad corridor by two parallel, contiguous strips of land: a road identified on the subdivision plats as "Technology Drive" (immediately adjacent to the parcels) and a strip of land identified on the subdivision plats as "common property (Block 'A')" (between Technology Drive and the railroad corridor), Pressly Pls.' Exs. D-1 at 2, D-2 at 3, D-3 at 2.[29] Plaintiffs contend that on the date that the NITUs were issued, the owners of these parcels possessed a fee interest in both the common property and the land underlying Technology Drive, and therefore owned to the centerline of the railroad corridor.[30] Defendant responds that the City of Fishers, and not the parcel owners, owned the common property on the date that the NITUs were issued, therefore blocking any interest the parcel owners could claim in the railroad corridor. In support of this contention, defendant observes that the Partnership dedicated the common property identified on the three plats to the City of Fishers on June 8, 2017, Pressly Pls.' Exs. D-6, D-7 at 4-7, D-8 at 4-7, and that the City of Fishers accepted the dedications on June 26, 2017, Pressly Pls.' Ex. D-7 at 2-3. Defendant also argues that, in any event, the Partnership owns the reversionary interest in Technology Drive, further blocking any interest that the parcel owners could claim in the railroad corridor. Given these arguments, there are two controlling questions: (1) Who owned Technology Drive on the date of the taking? (2) Who owned the common property on the date of the taking? If the relevant parcel owners did not own either strip of land on the date of the taking, then their claims must fail.

### 1. Technology Drive

Turning first to the ownership of the fee estate underlying Technology Drive, each of the plats includes the following statement, or a substantially similar statement, dedicating the platted streets to public use:

---

[29] The road is identified as "Technology Drive" on the subdivision plats but as "Technology Lane" on current maps.

[30] There is no dispute that the railroad company possesses an easement over this portion of the railroad corridor.

> ALL STREETS SHOWN ON THE WITHIN PLAT ARE HEREBY
> DEDICATED TO THE PERPETUAL USE OF THE PUBLIC FOR PROPER
> PURPOSES, RESERVING TO THE DEDICATORS, THEIR SUCCESSORS
> OR ASSIGNS THE REVERSION OR REVERSIONS THEREOF, WHENEVER
> DISCONTINUED BY LAW.

Pressly Pls.' Ex. D-1 at 2; accord Pressly Pls.' Exs. D-2 at 3, D-3 at 2.  In Indiana, "one who dedicates a street, retaining the adjoining lots, retains the fee in the street, which fee will pass from him by a conveyance of the lots."  Erwin v. Cent. Union Tel. Co., 46 N.E. 667, 669 (Ind. 1897).  In particular,

> a conveyance of land bounded on a highway carries with it the fee to the center of
> the road, as part and parcel of the grant, unless such inference shall be expressly
> excluded, and . . . this rule is applicable where the land conveyed is a lot or part of
> a lot in a town or city, designated on the plat by its number, or ascertained by its
> appropriate description, and abutting on a public street, lane, or alley.

Cox, 48 Ind. at 188; accord Swaim, 171 N.E. at 876 n.1 ("Where land has been dedicated by its owner for a street or highway, a subsequent conveyance of the abutting land by such owner carries with it the fee to the center of the street or highway, as it will not be presumed that a grantor who parts with all his right and title to the adjoining land intends to withhold his interest in the road to the middle of it.").  Thus, "when streets are vacated the fee thereof to the center of the street continues in the owner of the abutting land; in other words, it goes back to the grantee, immediate or remote, of the owner who dedicated it to public use."  Brackney v. Boyd, 125 N.E. 238, 238 (Ind. App. 1919); accord AmRhein v. Eden, 779 N.E.2d 1197, 1209 (Ind. Ct. App. 2002) ("'Generally speaking when a street or highway is vacated or abandoned the title to the land reverts to the abutting property owners.'  This rule is based upon the presumption that the abutting landowners own to the center of the street or highway subject only to an easement of the public to use the street or highway." (quoting Gorby v. McEndarfer, 191 N.E.2d 786, 791 (Ind. App. 1963))); cf. Kosciusko Cnty. Cmty. Fair, Inc. v. Clemens, 116 N.E.3d 1131, 1136-37 (Ind. Ct. App. 2018) (holding, where a restrictive covenant provided that it was enforceable by the homeowner's "successors and assigns," that a homeowner's "successor in title" to the affected property could enforce the restrictive covenant).

It is readily apparent that the statement on the Northeast Commerce Park plats dedicating the platted streets to public use is merely a restatement of the common law in Indiana. Consistent with the common law, the Partnership (1) dedicated the platted streets to public use; (2) retained the right to recover the streets if they were vacated or abandoned; and (3) noted that the right to recover the streets belonged to it and its immediate or remote grantees.  The plaintiffs who own the parcels at issue are remote grantees of the Partnership.  See Pressly Pls.' Ex. F-6 at 18-21, 25-26, 175.  Accordingly, under the centerline presumption, they own a fee simple interest to the centerline of Technology Drive subject to the public use easement.

## 2. The Common Property

To establish that they own a fee simple interest in the other half of Technology Drive, these parcel owners must also possess a fee simple interest in the common property situated between Technology Drive and the railroad corridor (since the fee owner of the common property owns to the centerline of Technology Drive). Each plat identifies the strip of land between Technology Drive and the railroad corridor as "common property," and indicates that the subdivision phase consists of the lots, "together with common property ('Block A'), streets and easements" as therein depicted. Pressly Pls.' Exs. D-1 at 2, D-2 at 3; accord Pressly Pls.' Ex. D-3 at 2; see also Pressly Pls.' Suppl. Ex. J at 425-26 (requiring, in the "Subdivision Control" chapter of the then-Town of Fishers comprehensive plan, that plats "indicate and show . . . [a]ccurate outlines . . . of any area to be reserved by deed or covenant for common use by owners of land obtained in the plat"). The plats do not, however, indicate who would own the common property upon the conveyance of the platted lots. See Pressly Pls.' Exs. D-1 at 2, D-2 at 3, D-3 at 2. And, notwithstanding the requirements of the 1986 ordinance, the Declaration is similarly silent on this issue, see Pressly Pls.' Ex. D-5, and there is no evidence that the property owners association described in the Declaration was ever constituted, Pressly Pls.' Suppl. Ex. K ¶ 24. Moreover, the applicable local ordinances, the Indiana Code, and Indiana case law provide practically no guidance regarding the ownership of land designated on a plat as common property.[31] See, e.g., Pressly Pls.' Suppl. Ex. H (1986 ordinance); Pressly Pls.' Suppl. Ex. J (then-Town of Fishers comprehensive plan).

Given this lack of guidance, plaintiffs turn to the definitions of "common property" ("1. Real property that is held by two or more persons with no right of survivorship." or "2. Common area.") and "common area" ("1. . . . The realty that all tenants may use though the landlord retains control and responsibility over it." or "2. An area owned and used in common by the residents of a condominium, subdivision, or planned-unit development.") set forth in Black's Law Dictionary, and argue that "[b]ecause the Declaration identifies that expenses associated with Common Areas are to be split based upon a pro-rata share of the areas of the owners' lots, the intent of the dedicators was to vest ownership of the common property, including Block A, with the lot owners." Pressly Pls.' Mot. 8-9. Plaintiffs further contend that because the Partnership did not expressly reserve the reversion in the common property, as it did with the streets, it intended that title to the common property be held by the lot owners. Defendant, in contrast, argues that the plats reflect that the Partnership did not intend to convey ownership in the common property to the lot owners, remarking that the plats identify the common property and lots as distinct elements, and that the Partnership later represented to the City of Fishers that it owned the common property when it dedicated it to the City of Fishers in 2017 for use as a public right of way.

---

[31] Notably, section 8.4.3 of the current zoning code of the City of Fishers provides that "[a]ll open space, common area and amenities shall be owned, operated and maintained in perpetuity by an owners' association, condominium association, or similar legal entity." Fishers, Ind., Unified Development Ordinance (July 20, 2018), http://online.encodeplus.com/regs/fishers-in/doc-viewer.aspx#secid-266.

As the parties observe, the three plats at issue do not include any language affirmatively declaring what interest, if any, the Partnership was retaining in the common property. However, the lack of such language on the plats does not mean that the Partnership intended to convey a fee simple interest in the common property to the adjacent lot owners. In fact, the opposite conclusion must be drawn. The relevant local and state legal authorities do not provide any rules or presumptions governing the ownership of land designated as "common property," "common ground," or "common area" on a plat. Thus, absent any evidence on the plats that the Partnership intended to relinquish fee ownership of the common property to the adjacent lot owners,[32] the court must conclude that the Partnership continued to own the common property after it recorded the plats.

Other evidence in the record before the court supports this conclusion. The Declaration does not indicate who owns the common property, but merely provides that all of the lot owners (regardless of their adjacency to the common property) must pay to maintain and preserve a retention pond and swales. Further, each of the deeds through which the relevant plaintiffs acquired their parcels describes the property being conveyed as a numbered lot in the subdivision, and lacks any reference to the common property.[33] Finally, the Partnership represented to the City of Fishers that it owned the common property when it dedicated the same for use as a public right of way, and the record before the court contains no evidence that any of the subdivision's lot owners objected to the dedication as an infringement of their property rights.

In short, based on the evidence before the court, plaintiffs have not established, as a matter of law, that the Group 3 plaintiffs who own parcels in the Northeast Commerce Park subdivision held a fee simple interest in the common property at the time that the NITUs were issued. Accordingly, those plaintiffs do not have a fee simple interest in the land underlying the railroad corridor. There being no genuine issues of material fact, defendant is entitled to summary judgment with respect to the claims of these plaintiffs.

---

[32] Plaintiffs' reliance on the dictionary definitions of "common property" and "common area" is unavailing. In Indiana, residents of a condominium, subdivision, or planned unit development do not necessarily own the associated common areas. See, e.g., City of Indianapolis v. Towne & Terrace Corp., 106 N.E.3d 507, 509 (Ind. Ct. App. 2018) ("Unlike more recent condominium developments, Towne & Terrace homeowners are members of Towne & Terrace and do not own any interest in its common areas."); Pulte Homes of Ind., LLC v. Hendricks Cnty. Assessor, 42 N.E.3d 590, 592 (Ind. T.C. 2015) (remarking that the developer "owns a substantial number of common area parcels of land that are within several residential neighborhoods").

[33] To the extent that the "non-exclusive easements" conveyed by one of the deeds, Pressly Pls.' Ex. F-6 at 21, included the common property, the common property necessarily was not being conveyed in fee simple.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS** the <u>Pressly</u> and <u>ATS Ford</u> plaintiffs' motions for summary judgment—and **DENIES** defendant's cross-motions for summary judgment—with respect to the following claims:

- <u>Pressly</u>:  1a, 1b, 41, 56, 64a, 64b, 78, 83, 93, 95, 109a, 109b, 110, 124, 130, 137, 150a, 150b, 151, 153, 162, 215, 216, 217, 249, 270a, 270b, 270c, 270d, 270e, 278, 284, 290, 292a, 292b, and 298.

- <u>ATS Ford</u>:  20 and 32.

These claims shall be transferred to Group 1 for the determination of just compensation.

In addition, the court **GRANTS** defendant's cross-motions for summary judgment—and **DENIES** plaintiffs' motions for summary judgment—with respect to the following claims:

- <u>Pressly</u>:  16, 32, 39, 103, 147a, 147b, 204a, 204b, 204c, 204d, 211, 247a, 247b, 265, 268a, 268b, 268c, and 268d.

- <u>ATS Ford</u>:  2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 21, 27, and 34 (the portion affected the Threlkell release).

These claims are **DISMISSED WITH PREJUDICE**.

Finally, the court **DENIES** all summary judgment motions with respect to the following claims:

- <u>ATS Ford</u>: 34 (the portion affected only by the Culbertson deed), and 35.

By **no later than Friday, April 15, 2022**, the parties shall file a joint status report suggesting further proceedings on these claims, as well as on the claims transferred to Group 1.  In addition, by that **same deadline**, plaintiffs in <u>Pressly</u> and <u>ATS Ford</u> shall file updated notices identifying the claims assigned to Group 1 and Group 3.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

-31-